UNCLASSIFIED//FOR PUBLIC RELEASE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                          |   |                          |
|--------------------------|---|--------------------------|
| MOHAMMEDOU OULD SALAHI   | : |                          |
|                          | : |                          |
| Petitioner,              | : | Civil Action No. 05-CV-0569 |
| v.                       | : |                          |
|                          | : |                          |
| BARACK H. OBAMA, et al., | : |                          |
|                          | : |                          |
| Respondents.             | : |                          |

**MEMORANDUM ORDER**

Mohammedou Ould Salahi (ISN 760), a Mauritanian national, alleges that he is illegally detained at Guantanamo Bay Naval Base and petitions this court for a writ of *habeas corpus* to secure his release.

Salahi has been in custody, without being charged with any crime, since November 2█ 2001. He was first taken into custody by █████████████████████████████ on suspicion that he had been involved in the failed "Millennium Plot" to bomb the Los Angeles International Airport. The United States ██████████████████████████ ████████ transported him to Guantanamo Bay in August 2002, Traverse Exhibit ("Tr. Exh.") BBB, ¶ 50. He has been there ever since. He filed this petition in 2005, but his case, like all other habeas corpus petitions from Guantanamo Bay, was put on hold until the Supreme Court decided that Guantanamo detainees have a right to habeas proceedings and

1

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

that this court has jurisdiction to hear them.  Boumediene
v. Bush, 128 S.Ct. 2229 (2008).  With Judge Hogan's omnibus
Case Management Order as a guide, I heard the merits of
Salahi's petition and of the government's response on
August 27 and 28, 2009, and on December 14 and 15, 2009.
Salahi appeared and testified by video feed from
Guantanamo.  After the hearing, Salahi and the government
filed post-hearing briefs.

The government's case, essentially, is that
Salahi was so connected to al-Qaida for a decade beginning
in 1990 that he must have been "part of" al-Qaida at the
time of his capture.  The allegations are that Salahi was a
recruiter for al-Qaida - that indeed he recruited two of
the men who became 9/11 hijackers and a third who became a
9/11 coordinator; that he actively supported his cousin,
who is or was one of Osama Bin Laden's spiritual advisors;
that he carried out orders to develop al-Qaida's
telecommunications capacity; and that he had connections
with an al-Qaida cell in Montreal.

Salahi concedes that he traveled to Afghanistan
in early 1990 to fight jihad against communists[1] and that
there he swore *bayat* to al-Qaida.  He maintains, however,
that his association with al-Qaida ended after 1992, and

---

[1]     The Soviet Union had withdrawn from Afghanistan in 1989.

UNCLASSIFIED//FOR PUBLIC RELEASE

that, even though he remained in contact thereafter with
people he knew to be al-Qaida members, he did nothing for
al-Qaida after that time.  Tr. Exh. BBB.

The government's case relies heavily on
statements made by Salahi himself, but the reliability of
those statements - most of them now retracted by Salahi -
is open to question.

## I. Legal Standards

If the government has any authority to detain
Salahi without charging him with a crime, its source is the
Authorization for Use of Military Force, Pub. L. 107-04,
115 Stat. 224 (2001).

> "The President is authorized to use all necessary
> and appropriate force against those nations,
> organizations, or persons he determines planned,
> authorized, committed, or aided the terrorist
> attacks that occurred on September 11, 2001, or
> harbored such organizations or persons, in order
> to prevent any future acts of international
> terrorism against the United States by such
> nations, organizations or persons."
> Authorization for Use of Military Force, Pub. L.
> 107-04, 115 Stat. 224 (2001).

That purpose, the "prevent[ion of] any future acts of
international terrorism," has the Supreme Court's seal of
approval, see Boumediene, 128 S.Ct. at 2277 ("The law must
accord the Executive substantial authority to apprehend and
detain those who pose a real danger to our security.") -
those who, as the government argued in Hamdi v. Rumsfeld,

124 S.Ct. 2633, 2639 (2004), were "part of or supporting forces hostile to the United States or coalition partners . . . and who engaged in an armed conflict against the United States." (internal quotations omitted).

## A. "Part of" and "substantial support"

Following Hamdi and Boumediene, the President's power to detain, and the development of tests to determine who was "part of" al-Qaida or the Taliban and what constituted "substantial support" were left to the lower courts.

In this case, until very recently, the government has focused entirely on its assertion that Salahi was "part of" al-Qaida,[2] relying on evidence of Salahi's pre-capture support of al-Qaida only to bolster that assertion. In an eleventh hour brief, the government has invoked the "purposeful[] and material[] support" standard that was approved in Al-Bihani v. Obama, 590 F.3d 866, 872 (D.C. Cir. 2010), inviting the denial of Salahi's petition on that basis as well - or in the alternative. Respondents' Response to Petitioner's Closing Brief, at 12-13.[3]

---

[2]     The government also argued at first that Salahi was also detainable under the "aided in 9/11" prong of the AUMF, but it has now abandoned that theory, acknowledging that Salahi probably did not even know about the 9/11 attacks.

[3]     I have reconsidered my order striking that brief.

UNCLASSIFIED//FOR PUBLIC RELEASE

The "purposeful[] and material[] support" standard is a non-starter. As the following discussion will make clear, Salahi may very well have been an al-Qaida sympathizer, and the evidence does show that he provided some support to al-Qaida, or to people he knew to be al-Qaida. Such support was sporadic, however, and, at the time of his capture, non-existent. In any event, what the standard approved in <u>Al-Bihani</u> actually covers is "those who purposefully and materially supported such forces <u>in</u> <u>hostilities against U.S. Coalition partners</u>." 530 F.3d at 872 (emphasis added). The evidence in this record cannot possibly be stretched far enough to fit that test.[4] I will consider the evidence of Salahi's "support" to the extent that it is relevant to proving that he was "part of" al-Qaida, and I will give it such weight in that regard as I consider appropriate.

The test now applied by most judges of this court for determining who is or was "part of" al-Qaida was first articulated by Judge Bates: "whether the individual functions or participates within or under the command

---

[4]     The <u>Al-Bihani</u> panel extracted the test from the 2006 and 2009 Military Commission Acts, both of which made such "purposeful[] and material[] support" <u>triable offenses</u>. The panel concluded that "the government's detention authority logically covers a category of persons no narrower than is covered by its military commission authority." 530 F.3d at 872. Where, as here, the government clearly has no triable criminal case of "purposeful and material support" against Salahi, the logic of that conclusion escapes me.

5

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

structure of the organization - i.e., whether he receives and executes orders or directions." Hamlily v. Obama, 616 F. Supp. 2d 63, 75 (D.D.C. 2009); see Awad v. Obama, 646 F. Supp. 2d 20, 23 (D.D.C. 2009)(appeal pending).

A detainee may fit within or under al-Qaida's "command structure" even if he never actually fights for al-Qaida. Al-Bihani, 590 F.3d at 872. Detention is lawful under the "part of" prong, if the detainee has received and executed al-Qaida's orders, even if he has only been a cook in an al-Qaida camp. Id., accord, Gherebi v. Obama, 609 F. Supp. 2d 43, 69, n. 19 (D.D.C. 2009). It has been suggested that an al-Qaida sympathizer who is outside the command structure must have "take[n] a direct part in the hostilities" to be detainable, Gherebi, 609 F. Supp. 2d at 69. Al-Bihani appears to have rejected that suggestion, but neither Al-Bihani nor any other case provides a bright-line test for determining who was and who was not "part of" al-Qaida at the time of capture. The decision, in other words, depends on the sufficiency of the evidence.

**B. Temporal issue and burden of proof**

The question of when a detainee must have been a "part of" al-Qaida to be detainable is at the center of this case, because it is clear that Salahi was at one point a sworn al-Qaida member.

6

UNCLASSIFIED//FOR PUBLIC RELEASE

The government had the burden of proving the lawfulness of the detention under the AUMF – i.e., detention without criminal charges or trial – by a preponderance of the evidence.[5]  In re Guantanamo Bay Detainee Litig., Misc. No. 08-442, CMO § II (A); Awad, 646 F. Supp. 2d at 23-24.  The government also had to show that Salahi's detention was lawful at the time of his capture. See, Gherebi, 609 F. Supp. 2d. at 71; Respondents' Supplemental Memorandum Regarding the Temporal Scope of the Government's Detention Authority, at 2.  The government was not required to produce evidence of some affirmative "part of al-Qaida" act by the petitioner that took place after 9/11.[6]  A mechanical requirement of that kind would lead to the illogical and dangerous result that a proven "sleeper agent" who was actually sleeping on and after 9/11 could not be detained.  Gherebi, 609 F. Supp. 2d at 67.

It is undisputed that Salahi swore *bayat* and was a member of al-Qaida in 1990, but the government had to show that he was still (or again) within its command structure when he was captured on November 2 2001.

_____

[5]         The Court of Appeals has rejected a constitutional challenge to the preponderance standard in these detainee habeas cases, Al-Bihani v. Obama, 590 F.3d at 878 (citing Hamdi v. Rumsfeld, 542 U.S. 507, 533-34 (2004)).
[6]         To the extent Salahi's arguments about temporal scope rest on principles of the international law of war, they must be rejected after Al-Bihani, 590 F.3d at 871.

7

UNCLASSIFIED//FOR PUBLIC RELEASE

Salahi's admission that he once was part of al-Qaida but that he severed his ties after 1992 raises burden-of-proof questions: May the burden lawfully be shifted to Salahi to prove his dis-association? If so, at what point does the burden shift? Judge Leon did not address burdens of proof when he found that a petitioner had "vitiated" his relationship with al-Qaida. See, Al Ginco v. Obama, 626 F. Supp. 2d 123, 128-30 (D.D.C. 2009). Nor did Judge Urbina, when he granted the writ in part because there was evidence that the detainee had severed his relationship with al-Qaida by leaving al-Farouq training camp early. Hatim v. Obama, 2009 WL 5191429, at *10, 12 (D.D.C. Dec. 15, 2009).

In Al-Bihani, however, the Court of Appeals clearly indicates that there is nothing unconstitutional about shifting the burden to a detainee to rebut a credible government showing "with more persuasive evidence," 590 F.3d at 878, citing Hamdi v. Rumsfeld, 542 U.S. 507, 533-34 (2004). Such a requirement, the Al-Bihani court says, "mirrors a preponderance standard." Id.

If that is the rule, one might reasonably ask, how can Guantanamo detainees - locked up for years on a remote island, cut off from the world, without resources, with only such access to intelligence sources and witnesses as the government deigns to give them - how can such people

possibly carry the burden of rebuttal, even against weak
government cases?  The answer, unfortunately for detainee
petitioners, is that they are indeed at a considerable
disadvantage, and that successful rebuttals of credible
government cases will be rare events.  The Court of Appeals
has acknowledged this imbalance and approved it: "[P]lacing
a lower burden on the government defending a wartime
detention – where national security interests are at their
zenith and the rights of the alien petitioner at their
nadir – is . . . permissible."  Id.

A habeas court must consider the government's
factual showing of probable cause and look to the
petitioner for rebuttal when that showing is both credible
and significant.  It is only fair to the petitioner,
however – and, considering the government's built-in
advantage, not unfair to the government – to view the
government's showing with something like skepticism,
drawing only such inferences as are compelled by the
quality of the evidence.[7]

---

[7]     I have rejected the government's broadest assertion, that
Salahi's concession of al-Qaida membership in the early 1990's shifted
the burden of proof, requiring that he prove affirmative acts of dis-
association to show that he was not a member in 2001.  It is true, as I
observed at the close of the hearing, Hr. Tr. 644-45, 651, that Salahi
has adduced no evidence that he "rejected" al-Qaida – that he acted
affirmatively to sever his ties – but I have been persuaded, see
Petitioner's Closing Br. at 13-14, that he did not need to.  The
criminal law of withdrawal from a conspiracy has no place in this
proceeding, and in any case, the al-Qaida that Salahi joined in 1991

UNCLASSIFIED//FOR PUBLIC RELEASE

## C. Coerced statements and hearsay

There is ample evidence in this record that
Salahi was subjected to extensive and severe mistreatment
at Guantanamo from mid-June 2003 to September 2003, Tr.
Exh. C, D, I, P, BB – HH, JJ, LL, OO, PP, QQ, RR, SS, BBB;
AFR Exh. 93; Hr. Tr. 411-436.  Salahi's position is that
every incriminating statement he made while in custody must
therefore be disregarded.[8]  Salahi made most, if not all, of
the statements that the government seeks to use against him
during the mistreatment or during the 2 years following it.

The government acknowledges that Salahi's abusive
treatment could diminish the reliability of some of his
statements.  But abuse and coercive interrogation methods
do not throw a blanket over every statement, no matter when
given, or to whom, or under what circumstances.
Allegations of mistreatment certainly taint petitioner's
statements, raising questions about their reliability.
See, e.g., Mohammed v. Obama, 2009 WL 4884194, * 24-27

---

was very different from the al-Qaida that turned against the United
States in the latter part of the 1990s.
[8]     Dr. Vincent James Iacopino, M.D., Ph.D, reviewed Salahi's medical
records and gave his opinion that Salahi's allegations are consistent
with the physical and psychological evidence documented in his medical
records and that the mistreatment "likely compromised the accuracy of
the information he has provided to interrogators."  Hearing Transcript
("Hr. Tr.") 255, 292-293, 298-301; Tr. Exhs. F, SS.  Dr. Iacopino was
earnest and well-meaning, but he can hardly be described as
independent.  I found his testimony to be biased and unpersuasive,
particularly as the subject of his testimony was not the subject of his
professional training.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

(D.D.C. Dec. 16, 2009); Al Rabiah v. United States, 2009 WL
3083077, *21 (D.D.C. Sept. 17, 2009) (citing U.S. v.
Karake, 443 F. Supp. 2d 8, 87-88 (D.D.C. 2006)). But at
some point - after the passage of time and intervening
events, and considering the circumstances - the taint of
abuse and coercion may be attenuated enough for a witness's
statements to be considered reliable - there must certainly
be a "clean break" between the mistreatment and any such
statement. Karake, 433 F. Supp. 2d at 87; accord, Anam v.
Obama, 2010 WL 58965, *4 (D.D.C. January 6, 2010). Here,
it is the government's burden to demonstrate that a
particular statement was not the product of coercion, and
that it has other indicia of reliability. Anam, 2010 WL
58965 at *5.

The government submits that the only statements
of Salahi's on which it relies were made after a clean
break, and after the passage of enough time to attenuate
any taint, and that they are corroborated by documentary
evidence and the statements of other persons (some of them
detainees). Salahi attacks corroborating statements as
unreliable hearsay, or subject to the same coercive tactics
described above, or both. My approach here, as in Awad,
has been to formally "receive" all the evidence offered by

UNCLASSIFIED//FOR PUBLIC RELEASE

either side, and to give it the weight I believe it
deserves.  See Awad, 646 F. Supp. 2d at 23.

## II. The Evidence

### A. Timeline

| Date | Activities |
|------|------------|
| 1988 | Began studying at the University of Duisberg in Germany.  (Tr. Exh. BBB) |
| 1990 | Travelled to Afghanistan, trained for six weeks at al-Farouq, swore *bayat* to al-Qaida, and was given the *kunya* "Abu Musab." (Tr. Exh. BBB) |
| 1991 | Returned to Germany to continue his studies. |
|  | ████████ |
| Feb-92 | Returned to Afghanistan with 3 friends (including Karim Mehdi and Ely Taleb al-Qadr), met with al Bahrani, and went to fight in the battle at Gardez as member of al-Qaida.  Met Christopher Paul in Afghanistan. |
| Mar-92 | Returned to Germany to complete his studies, after the communist government, led by Mohammed Najibullah and supported by the Soviet Union, fell.  Wife joined him in Germany. |
| Mar-93 | Christopher Paul may have visited Mehdi in Germany for three weeks. Salahi may have seen him during this time. |
| Aug-93 | Returned to Mauritania to visit family.  Went to an Al-Qaida safehouse in Mauritania with Abu Hafs, may have seen a Libyan al-Qaida member, al-Lidi, there. |
| May-95 | * Graduated from University of Duisburg with degree in electrical engineering.[9] |
| May-95 | * Began working at ⑥█████ as a process engineer (in Reutlingen, Germany). |
| Dec-95 | Hosted Abu Hijar al-Iraqi in Germany, may have received information about an al-Qaida telecommunications project in Sudan. |
| Jan-96 | Hosted Abu Hijar al-Iraqi again in Germany, may have discussed the al-Qaida project in Sudan. |
| May-96 | * Began working on obtaining an unlimited visa and work permit to stay in Germany; simultaneously began trying to get landed immigrant status in Canada (at Hosni Mohsen's suggestion). |
| Dec-96 | * Stopped working at ⑥█████ |
| Jan-97 | * Began working as a consultant for the ⑥██████████ in Esson, Germany. |
| Jan-97 | Sent a fax to Christopher Paul, requesting information about where to send would-be jihadists. (APR Exh. 70) |
| Dec-97 | Transferred $4,000 for Abu Hafs. |
| Dec-97 | Created a jihad website, but there is no proof that it advocated violence, and Salahi claims it did not. |
| Jan-98 | * Drove Paul to the airport, after Paul visited Mehdi for several weeks. |

---

[9]   Asterisk indicates that the month of the event is estimated.

UNCLASSIFIED//FOR PUBLIC RELEASE

| | |
|---|---|
| Jun-98 | * Obtained landed immigrant status in Canada. |
| Sep-98 | Visited Hosni Mohsen in Canada. |
| Dec-98 | Transferred $4,000 for Abu Hafs. |
| Jan-99 | * Received phone call from Abu Hafs, which was allegedly made from bin Laden's satellite phone. |
| Oct-99 | * Ganczarski returned to Germany from Afghanistan and may have delivered a message to Salahi about a project for improving internet access in Pakistan and Afghanistan.  Salahi may have received passports from him.  Salahi claims that he received passports from Abu Hafs only. |
| Oct-99 | Met with al-Shibh and two other men, allegedly encouraged them to go to Afghanistan instead of Chechnya and to get Pakistan visas. |
| Nov-99 | Housed al-Shibh and two other men for one night, and drove them to the train station in the morning. |
| Nov-99 | * Stopped working at Ceylan. |
| Nov-99 | Moved from Germany to Canada; lived with ████████ and then at the Al Sunna Mosque, where he was an imam.  Registered for and began taking classes at Polytechnique de Montreal; ██████ "bad friends" visited the apartment -- ████ (head of al-Qaida cell in Montreal) and ██████ (financier for al-Qaida) (AFR Exh. 14); ██████ had connections with Ressam, who was arrested in the Millennium Bomb plot. |
| Dec-99 | * In Canada, Laabidi asked him to transfer money, but Salahi did not do so.  Observed al-Qaida members giving Mohsen bags of "equipment for the brothers" before his trip to Chechnya.  Called Christopher Paul twice. |
| Dec-99 | Ahmed Ressam was arrested in connection with the Millennium Plot. |
| Dec-99 | Salahi was questioned ████████ regarding the Millennium Plot, moved into the mosque.  Sent Moshen a Tunisian passport. |
| Jan-00 | Family called to inform him that his mother was sick.  Decided to return to Mauritania. |
| Jan-00 | Flew from Canada to Senegal, where brothers met him to take him to Mauritania; he and brothers were seized by ██ ████ authorities, and were questioned about the Millennium plot.  An American came and took pictures; then, someone he presumed was American flew him to Mauritania, where he was questioned further by Mauritanian authorities about the Millennium plot. |
| Feb-00 | Interrogated by ██ re Millennium plot. |
| 2/14/2000 | * ██████ released him, concluding there was no basis to believe he was involved in the Millennium plot. |
| Apr-00 | Returned to Germany, but was arrested upon arrival because of unemployment fraud issue |
| May-00 | Was released, and returned to Mauritania.  ██ ████ authorities took away his passport and put him under "house arrest."  Began working at ██ in Mauritania. |
| Jan-01 | Gave one of the fraudulent passports he received from Abu Hafs to his wife, whom he was divorcing. |
| Apr-01 | Still in contact with Ganczarski, through emails and phone calls. |
| May-01 | Still in contact with Karim Mehdi, through emails and phone calls. |
| Jun-01 | Gave male passport to ██████, who claimed to be its owner. |
| Jul-01 | Stopped working at ██; began working at ██████ in Nouakchott |
| Sep-01 | Authorities seized computer at BITS. |
| 9/29/2001 | Arrested in Mauritania; authorities told him ██████ arrest because Salahi was allegedly involved in Millennium plot. |

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

| 10/12/2001 | While he was detained, agents performed a search at his house, seizing tapes and documents. |
| 10/15/2001 | Released by █████████ authorities. |
| 11/█/2001 | ████████████████████████████ took him into custody. |

## B. Initial Relationship with al-Qaida

Salahi admits that he trained at the al-Farouq training camp in Afghanistan in late 1990 and early 1991; that he swore *bayat* in 1991, see Hr. Tr., 370-71;[10] and that he returned to Afghanistan in early 1992 to fight in the battle at Gardez as a member of an al-Qaida mortar battery. See, AFR at 8 (ISN 760 FD-302); Hr. Tr. at 372-374.

In Salahi's submission, this is where his connection to al-Qaida ends. He testified that he was "part of" al-Qaida only to join the struggle against the communists, and that, after his final trip to Afghanistan in 1992, he severed ties with al-Qaida and provided no further support to the organization.[11] Tr. Exh. BBB, ¶¶ 99, 101; Hr. Tr. at 378. In a statement made in December 2004, about a year after his coercive interrogation and after he

---

[10]   The government asserts that Salahi swore the oath to Osama bin Laden, and did so at the same time as Noumane Ould Ahmed Ould Boullahy, who went on to become one of bin Laden's bodyguards. AFR at 7. There is no evidence that Salahi maintained, or that he ever had, any relationship with Boullahy. Salahi maintains that he swore *bayat* to Iz Eldin al-Bahraini, or to the organization as a whole. Tr. Exh. BBB, ¶ 99, 105; Hr. Tr. at 498-500.

[11]   Salahi admits to attempting to travel to Bosnia-Herzegovina through Slovenia in December 1992 to join the jihad there, but ultimately returned to Germany because travel was too difficult. AFR Exh. 22; Hr. Tr. at 378. But, he claims he did not do so at the request of al-Qaida. Hr. Tr. at 379.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

had disavowed earlier incriminating statements, he recalled

telling Abu Hafs that he wanted "work a little bit." AFR

Exh. 5.  The inference the government seeks to draw from

this snippet is that Salahi wanted to continue working for

al-Qaida, cf. Hr. Tr. 453-4, but the words are few enough,

and ambiguous enough, that the inference must be declined.

**B. Recruiting**

Not only did Salahi not sever his ties with al-

Qaida after 1992, the government maintains, but he

"actively recruited" for al-Qaida from 1991 to at least

1999.  The evidence for that proposition includes: (1)

statements by Salahi that, in 1999, he provided lodging and

advice to three men who were later involved in the 9/11

attacks; (2) a January 1997 fax from Salahi to a known al-

Qaida operative, Christopher Paul, asking where to send al-

Qaida recruits; (3) general statements of Salahi, made

while in custody, that he was a recruiter; and (4)

statements of another alleged terrorist - ██████████████

- implicating Salahi as an al-Qaida recruiter.

The most damaging allegation against Salahi is

that, in October 1999, he encouraged Ramzi bin al-Shibh,

Marwan al-Shehhi, and Ziad Jarrah to join al-Qaida.  Bin

al-Shibh has been identified as the primary contact for the

organizers of the 9/11 hijackers, and al-Shehhi and Jarrah

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

became two of the hijackers.  Under coercive interrogation,
Salahi confessed to facilitating travel for "several of the
9/11 hijackers to Chechnya," justifying his assistance as
"just" jihad.  AFR Exh. 45 (August 2, 2003).  Salahi's
testimony now is that he did nothing more than give bin al-
Shibh and his friends lodging for one night.  Tr. Exh. BBB,
¶¶ 111-118.

The government's proffered corroboration for
Salahi's 2003 statements about recruitment consists of
statements by ███████████████████████████
███████████  Karim Mehdi.  AFR Exh. ███ 56, 59.  Those
statements, if credited, would establish that Salahi met
with bin al-Shibh and two other men in October 1999; that
he encouraged them to travel to Afghanistan for training –
rather than Chechnya as they had intended; that he housed
them for at least one night ██████████████ that he gave
them instructions for traveling to Afghanistan and contacts
for their arrival; and that he drove them to the train
station the next morning.  Tr. Exh. BBB, ¶¶ 111-118.; ████
████████████████████████████  AFR Exh. 56
(Statement of Karim Mehdi).[12]  ███████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



Seeking to undermine this evidence about the 9/11 hijackers, Salahi emphasizes that his contact with these men occurred two years before the actual attacks.  He also points to ██ 1.5 ██████████ in which he said that the two men accompanying bin al-Shibh were not al-Shehhi and Jarrah, and that he did not convince bin al-Shibh to travel to Afghanistan instead of Chechnya.  AFR Exh. 37.  Salahi also argues that the statements of ████ ████████ Mehdi are too unreliable to serve as corroboration, ██████████████████████████████ ████████████████████████████████████ that Mehdi's statements were coerced by mistreatment, AFR

██████████████████████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Exh. 53-62 (sleep deprivation); that Mehdi was fed information by his interrogators, AFR Exh. 64, 65, 66; and that Mehdi has admitted to lying, AFR 59, 61, 64.   In addition, some of Mehdi's information is inconsistent with the statements of Salahi ███████████████ Mehdi said that they met more often than twice, including a meeting that took place at Salahi's house at a time when Salahi was in custody.   Upon learning that fact, Mehdi withdrew his statement about the meeting.   Mehdi's statements indicate only that Salahi knew bin al-Shibh and Jarrah were going to Afghanistan for training, not that Salahi encouraged them to do so.   AFR Exh. 56.  ██████████████



The application of appropriate judicial skepticism to this jumble of evidence yields the following finding: The government has

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

credibly shown, and Salahi has not rebutted the showing,
that ▮▮▮▮▮▮▮▮▮▮ Salahi provided lodging for three
men for one night at his home in Germany, that one of them
was Ramzi bin al-Shibh, and that there was discussion of
jihad and Afghanistan.

The government's other key piece of evidence
about Salahi's alleged recruitment for al-Qaida is a
January 26, 1997 fax from Salahi, using his *kunya* "Abu
Musab," to Christopher Paul, a.k.a. Abdul Melik, to ask for
help to find "a true Group and Place" for "some Brothers
want to make Djihad." AFR Exh. 70.  The fax bears Salahi's
*kunya*, Salahi's handwriting and home telephone number, and
was faxed from a store near Salahi's home. Hr. Tr. at 187-
88, 628.  Salahi admitted to sending the fax to this
acknowledged "man of great respect in Al-Qaida", AFR Exh.
75, as a way to "facilitate getting the brothers to fight,"
AFR Exh. 74, but later disavowed those statements, and said
that he had never seen the fax until interrogators
questioned him about it.  I find that the fax appears to be
authentic and speaks for itself, and that the filigree the
government seeks to add (facilitating getting the brothers
to fight, AFR Exh. 74; standing with Mehdi during a
telephone conversation, Hr. Tr. at 631; the uncorroborated
statement that the person about whom Salahi wrote the fax,

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Moussa, went on to fight in Afghanistan, AFR Exh. 75) is unnecessary to understand its meaning: that Salahi continued to be in touch with people he knew to be al-Qaida members, and that he was willing to refer would-be jihadists to them when the opportunity arose.

The remaining evidence that Salahi was an active recruiter is less significant. Salahi made several incriminating statements after coercive interrogation that he was a recruiter and spread propaganda about al-Qaida, but in none of those statements did he say he was tasked to do so, nor did he provide detail about any specific recruiting missions he was given. AFR Exhs. 27, ¶ 9; 29, ¶ 62; 96. Finally, the government suggests that a general statement ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉ They were not specific to al-Qaida, nor do they suggest that Salahi was tasked with an order to recruit al-Qaida members.

The government has not credibly shown Salahi to have been a "recruiter." What its evidence shows is that

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Salahi remained in contact with people he knew to be al-
Qaida members at least until November 1999, and that he was
willing to make a referral to a known al-Qaida member in
1997.

## C. Assistance with al-Qaida telecommunications projects

The government asserts that Salahi accepted
assignments to work on a number of al-Qaida
telecommunications projects.[13]  This narrative has two
parts: that Salahi's cousin and brother-in-law - Abu Hafs
al-Mauritanian - tasked him (a) with establishing an
international shortwave broadcasting station in Sudan and
(b) with establishing greater Internet connectivity between
Pakistan and Afghanistan.  AFR Exh. 32.[14]  Abu Hafs is
believed to be one of bin Laden's spiritual advisors and a
high-ranking leader of al-Qaida.  An undated interrogation
report has it that Salahi said that he received orders from
Abu Hafs, AFR Exh. 22, and "would have done almost anything
that was asked of him." AFR Exh. 24.  Salahi has not

---

[13]    The government, relying on the conclusions of Salahi's FBI
interrogators, also asserts that Salahi has "advanced knowledge of what
would be required to complete these tasks," AFR Exh. 16, and expertise
in al-Qaida internet communications, encryption and cyber-attacks, AFR
Exhs. 34, 39, 42.  These conclusions, which are too speculative to
credit, do not bespeak that Salahi was "part of" al-Qaida.
[14]    Salahi also told interrogators that Abu Hafs asked him to assist
in counterfeiting US currency, but that he did not do it because he was
attempting to obtain Canadian citizenship. AFR Exhs. 33, 28.

UNCLASSIFIED//FOR PUBLIC RELEASE

retracted his admission that he knew Abu Hafs to be an al-
Qaida member.[15]   Hr. Tr. at 514.

The first part of this story, developed entirely
from Salahi's statements and completely uncorroborated, is
that Abu Hafs gave orders about telecommunications projects
to Salahi through Abu Hijar al-Iraqi in 1995 and 1996, AFR
22, Hr. Tr. 458-459.   Salahi now admits only that he hosted
Abu Hijar al-Iraqi in Germany in 1995 and 1996 and that Abu
Hijar spoke to him about the telecommunications equipment
he (Abu Hijar) planned to purchase for Sudan. Hr. Tr. 459,
551-52, 628.

The second part of the telecommunications story
relates to an alleged 1999 assignment to assist with
Internet connectivity between Pakistan and Afghanistan and
is more troubling.   Under interrogation, Salahi named
Christian Ganczarski as the person who gave him this
assignment.   Ganczarski was returning to Germany from
Afghanistan.   He gave Salahi passports to assist him in
completing the task.[16]   Salahi was aware of the equipment

---

[15]   The government makes much of the fact that Salahi may have gone
with Abu Hafs to an al-Qaida safehouse in Mauritania in 1993,
presumably because the government believes this fact proves Salahi was
aware of his cousin's al-Qaida membership. Hr. Tr. 514-5.   Salahi
disagrees with the government's characterization of the location as a
"safehouse," but because Salahi concedes his cousin's membership, I
find no reason to belabor the analysis of a single trip to a house
nearly eight years before 9/11.
[16]   Nobody has attempted to explain how the passports would help with
the Internet connectivity project.

UNCLASSIFIED//FOR PUBLIC RELEASE

Ganczarski had purchased to work on the project, AFR Exhs.
22, ¶ 15; 85, ¶ 7-A; 98; Tr. Exh. T; Hr. Tr. at 554, 636,
and his computer contained a radio antenna sketch that the
government unsuccessfully attempts to link to Ganczarski
and this project, AFR Exh. 90.

Salahi now disavows any knowledge of whether
Garczarski went to Afghanistan to set up a radio
telecommunications system for al-Qaida, and denies that
Ganczarski delivered any messages to him about al-Qaida
projects. Tr. Exh. BBB, ¶ 124; Hr. Tr. 553. He does
acknowledge that around November 1999, Abu Hafs - not
Ganczarski - sent him a message encouraging him to return
to Afghanistan, and sent him two passports and money for
the trip. Hr. Tr. 553. One of the passports had been
issued to an unknown male; the other was the passport of
Abu Hafs' wife, who was Salahi's wife's sister. Salahi
explains that he declined to travel to Afghanistan because
he planned to travel to Canada, but he admits that he kept
both passports until January 2001, when, he says, he gave
the female passport to his then-wife, who he was divorcing.
Salahi kept the male passport until June 2001, when its
owner, ███████████ came to claim it. AFR Exhs. 49
(September 17, 2003), 32. The passport story that Salahi
tells now makes more sense than the one he told his

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

interrogators, but Salahi's admission that he received and held passports issued to other people raises unanswered questions about the lawfulness of his activities and the nature of his relationship with Abu Hafs.

The record also contains computer records seized in late September 2001 from ███ a Mauritanian technology equipment retailer and internet service provider and Salahi's employer from May 2000 to July 2001. The ███ records reflect transactions with a company called ███ ████████ for the purchase and shipment of radio equipment. On their face, the invoices reflect ordinary course of business transactions, but, when interrogated in September 2005, Salahi did not deny that the radio equipment was used by al-Qaida, AFR Exh. 16. Salahi now retracts any of his statements that might suggest that ███ provided equipment to al-Qaida. Tr. Exh. BBB, ¶ 125. The invoices appear to be characteristic of what is understood to be ███ business, and they do not connect Salahi to the transactions in any apparent way. Tr. Exh. DDD.

Also collected from the ███ computer were emails and documents describing plans for various cyber-attacks. AFR Exhs. 133, 135, 139. Two of the emails appear to be list-serve emails, sent to a large number of recipients, describing steps an individual should take if he wanted to

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

engage in an attack, AFR Exhs. 135, 139.  The third
document is not an email but a separate document - also
with specific instructions on implementing an attack.  AFR
135.  The documents are not evidence that Salahi engaged in
the cyber-attacks (materially supported al-Qaida in
hostilities), but they do show that he had access to the
information.  They corroborate statements of Salahi to the
effect that he knew about and had some involvement in
planning for denial of service computer attacks, AFR Exh.
39 (October 20, 2004) - attacks that, so far as we know,
never materialized.  Salahi also admitted to attempting to
start his web forum for this type of information, but said
that he did not do so because Ganczarski discouraged the
plan.  Id; AFR Exh. 81.

These ▆ documents have very little weight.
The cyber-attack documents do appear to establish Salahi's
knowledge of and interest in planned computer attacks, but
they do not show Salahi's active engagement, Tr. Exh. BBB,
¶¶ 122, 123.  Nevertheless, Salahi's credibility is
undermined by his insistence that his computer was accessed
by several other ▆ employees.  Hr. Tr. 475.  That
testimony, indeed, suggests that ▆ was populated by many
al-Qaida sympathizers, something which, if that were true,
would surely have been understood by Salahi.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

### D. Money Transfers

Salahi acknowledges that he transferred money for Abu Hafs twice - about $4,000 in December 1997 and another $4,000 in December 1998.  Hr. Tr. 631.  Here again, the government relies on nothing but Salahi's uncorroborated, coerced statements to conclude that the money transfers were done on behalf of and in support of al-Qaida. AFR Exh. 29 (describing al-Qaida's process for wiring money through innocent middlemen).  Salahi insists now that he was only helping Abu Hafs to send money to his family in Mauritania. Tr. Exh. BBB, ¶ 121.  Two money transfers in modest amounts a year apart would not even amount to material support (if support were the issue here, which it is not).  What they do show - as the recruiting and telecommunications support narratives did - is that Salahi had an ongoing and relatively close relationship with Abu Hafs, something like that described in Gherebi, a non-al-Qaida member providing housing to his al-Qaida member son, Gherebi v. Obama, 609 F. Supp. 2d 43.

Salahi admitted that he was asked to transfer money for Laabidi, the financier of al-Qaida's Montreal cell,[17] in 1999.  He did not admit, nor has it been shown,

---

[17]     Under interrogation, Salahi called Laabidi a terrorist who supported use of suicide bombers, AFR Exh. 48 (September 16, 2003), but he recanted all of his incriminating statements about Laabidi when he

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

that he complied with the request. AFR Exhs. 48 (September 16, 2003); 47 (Sept 11, 2003).

**F. Connections with Montreal al-Qaida cell**

Salahi lived in Canada for two months, from late November 1999 to January 2000. The government claims that, in that period, he developed strong ties to an al-Qaida cell in Montreal. Salahi concedes that he lived with ███ ███ but he has retracted statements made under interrogation that ███ friends who visited their shared apartment – ███████████ – were "very bad," AFR Exhs. 5, 14, that Hannachi was the leader of the al-Qaida cell in Montreal, and that Laabidi was the cell's financier. AFR Exh. 29.

Another Montreal resident, Ahmed Ressam, was arrested and charged with preparing to carry out the so-called Millennium plot. One document, pocket litter seized from Mohsen upon his arrest, includes both Salahi's name and Ressam's phone number. AFR Exh. 20. That document does link Mohsen, Salahi and Ressam together, but how, and for what, remain unexplained. Salahi almost immediately retracted his statements that implicated him in the Millennium plot. AFR Exh. 5, Tr. Exh. Y. The government

---

discovered that he would be required 2 ███████████
Tr. Exh. BBB, ¶ 130.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

does not allege that Salahi participated in the Millennium plot.[18]

Other bits of evidence adduced to show that Salahi was involved with the Montreal cell include:   (1) the undisputed fact that Salahi acted for a time as an imam at the Alsunnah mosque, which gave him the opportunity to "inject propaganda and recruit for jihad"; (2) Salahi's uncorroborated statement that he accompanied several al-Qaida members who were transporting bags of "equipment for the brothers" to ▮▮▮▮ before ▮▮▮▮ traveled to Turkey and Chechnya as a courier for ▮▮▮▮ see AFR Exhs. 88 at ¶¶ 1L, 1 AH; ISN 760 FD-302 7-18-05 at 6; and (3) Salahi's uncorroborated statement that he allowed Laabidi to use his bank account to launder money and that he witnessed Laabidi giving cash to Hannachi.  See AFR Exhs. 33, 88 at ¶ 1W. Salahi now retracts those statements.

The Montreal evidence might well be enough to support a criminal charge of providing material support to al-Qaida, if Salahi were criminally charged, and if the evidence were admissible in a criminal proceeding.  It does not prove that he "purposeful[] and material[] supported such forces in hostilities," however, nor does it add any

---

[18]    Ressam agreed to cooperate and testify against others involved in the Millennium plot.  Ressam provided statements that the government has used in defending detentions in other habeas petitions before this Court, but he conspicuously fails to implicate Salahi.  Hr. Tr. 202.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

thing of significance to the proof that Salahi was "part
of" al-Qaida.

## G. Relationships with known al-Qaida members

The government suggests that Salahi's
relationships with the various al-Qaida members referenced
throughout this case, however brief those relationships,
prove that he is "part of" al-Qaida.  Associations alone
are not enough, of course, to make detention lawful, see
Al-Adahi v. Obama, 2009 WL 2584685, at * 16 (D.D.C. Aug.
21, 2009), but, depending on their nature and duration,
they could lend support to a finding of al-Qaida
membership.

The government's most damaging evidence with
respect to Salahi's associations is his admitted contacts
with his cousin and brother-in-law, Abu Hafs.  Those
contacts include: visiting an al-Qaida safehouse in
Mauritania in 1993; telephone and ███ contact right up to
2001;[19] money transfers; and one request from Abu Hafs for
Salahi to travel to Afghanistan, along with the passports
for the journey.  None of these events or incidents has
been shown to have happened within the command structure of
al-Qaida.

---

[19]     The government alleges that Abu Hafs called Salahi in December
1998 or January 1999, from the satellite phone of Osama bin Laden.  Hr.
Tr. 632.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Salahi's relationships with Karim Mehdi, who was convicted on terror charges in France, and with Christian Ganczarski, another convicted terrorist, are clearly of interest - Salahi was in contact with the two men until at least May 2001 and April 2001, respectively.  Hr. Tr. at 502, AFR Exhs. 119, 123.  But, the ███████ offered by the government as evidence of the relationships are not themselves incriminating; if anything, they suggest that the men were <u>not</u> in continuous contact.  For example, at one point, ███████████████████████████████████████

████████████████████████████████████████

███  AFR Exh. 123.  Rather, they tend to support Salahi's submission that he was attempting to find the appropriate balance - avoiding close relationships with al-Qaida members, but also trying to avoid making himself an enemy.

Salahi's limited relationships with Christopher Paul, who pled guilty in the United States to conspiracy to use a weapon of mass destruction and received a 20-year sentence; Abu Hijar al-Iraqi, Hr. Tr. 459, 551-52, 628; Hannachi and Laabidi, important figures in al-Qaida's Montreal cell; and al-Libi, a Libyan al-Qaida member, Hr. Tr. at 517, 524-5, are too brief and shallow to serve as an independent basis for detention.

### III. Conclusion

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The government had to adduce evidence - which is different from intelligence - showing that it was more likely than not that Salahi was "part of" al-Qaida.  To do so, it had to show that the support Salahi undoubtedly did provide from time to time was provided within al-Qaida's command structure.  The government has not done so.  The government has shown that Salahi was an al-Qaida sympathizer - perhaps a "fellow traveler"; that he was in touch with al-Qaida members; and that from time to time, before his capture, he provided sporadic support to members of al-Qaida.

The government's problem is that its proof that Salahi gave material support to terrorists is so attenuated, or so tainted by coercion and mistreatment, or so classified, that it cannot support a successful criminal prosecution.  Nevertheless, the government wants to hold Salahi indefinitely, because of its concern that he might renew his oath to al-Qaida and become a terrorist upon his release.  That concern may indeed be well-founded.  Salahi fought with al-Qaida in Afghanistan (twenty years ago), associated with at least a half-dozen known al-Qaida members and terrorists, and somehow found and lived among or with al-Qaida cell members in Montreal.  But a habeas court may not permit a man to be held indefinitely upon

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

suspicion, or because of the government's prediction that he may do unlawful acts in the future – any more than a habeas court may rely upon its prediction that a man will not be dangerous in the future and order his release if he was lawfully detained in the first place.  The question, upon which the government had the burden of proof, was whether, <u>at the time of his capture</u>, Salahi was a "part of" al-Qaida.  On the record before me, I cannot find that he was.

The petition for writ of habeas corpus is **granted**.  Salahi must be released from custody.  It is SO ORDERED.

_____/s/_____

JAMES ROBERSTON
United States District Judge

32

UNCLASSIFIED//FOR PUBLIC RELEASE