## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MOHAMEDOU OULD SALAHI | ) | |
| | ) | |
| Petitioner/Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05-0569 (RCL) |
| | ) | |
| BARACK OBAMA, *et al.*, | ) | |
| | ) | |
| Respondents/Defendants. | ) | |

_____)

## MOTION FOR ORDER TO SHOW CAUSE

Petitioner Mohamedou Ould Slahi respectfully moves this Court to issue the attached

proposed order directing Respondent the Secretary of Defense to show cause why an order

should not issue requiring the Defense Department to (1) promptly provide Petitioner a required

hearing before a Periodic Review Board; (2) cease interfering with Petitioner's access to this

habeas Court; and (3) cease imposing arbitrary and severe restrictions on Petitioner's conditions

of confinement.[1]

In support of this motion, undersigned counsel submit the following.[2]

---

[1] Petitioner's name is sometimes spelled "Salahi," including in the caption to this matter.  The
Secretary of Defense is Petitioner Slahi's custodian under 28 U.S.C. § 2241, *see Rasul v. Bush*,
542 U.S. 466, 483-84 (2004), and has been tasked by President Obama with implementing the
Periodic Review Board.  *See* Exec. Order No. 13567 § 3 ("The Secretary of Defense shall
coordinate a process of periodic review of continued law of war detention for each detainee
described in section 1(a) of this order.").

[2] As required by Local Civil Rule 7(m), undersigned counsel contacted counsel for the
Respondents before filing this motion.  Counsel for Respondents stated that they oppose this
motion.  Specifically with respect to Mr. Slahi's request for the return of his confiscated legal

## INTRODUCTION

Having unlawfully imprisoned Mr. Slahi for nearly thirteen years, the Department of Defense now compounds that illegality by violating its obligation to review whether his continuing detention at Guantánamo serves any purpose.  More than four years ago, President Obama ordered the Secretary of Defense to implement a mandatory Periodic Review Board ("PRB") process and hearing to determine whether detention pursuant to the 2001 Authorization for Use of Military Force (AUMF) continues to be justified for Mr. Slahi and prisoners like him. Even assuming the AUMF provided authorization for Mr. Slahi's initial detention in 2002— which Mr. Slahi contests and which no court has held—the Defense Department has not afforded him a PRB process to determine whether his detention should continue.  As Mr. Slahi and witnesses on his behalf will show once he receives a PRB hearing, Mr. Slahi presents no threat to the United States or any other country, and his continued detention is unjustified.  Mr. Slahi has made clear in everything he has written, including his recently-published, best-selling book, *Guantánamo Diary*, that he harbors no animosity to anyone—including his interrogators and guards—as a result of his incarceration.

Mr. Slahi and his counsel have reason to believe that the Defense Department's ongoing refusal to comply with the PRB requirements is aimed at prolonging Mr. Slahi's detention for the purpose of interrogation—in violation of the AUMF, the Constitution, and international law. Even if that were not the motive, the Defense Department's continuing failure to provide Mr. Slahi with a legally-required PRB hearing renders his detention independently unlawful.

---

materials discussed below, undersigned counsel have not been able to confirm that all of the materials have been returned; Respondents' counsel stated their belief that motion practice on this issue is premature and unnecessary and the parties have not been able to meaningfully confer.  Mr. Slahi's counsel disagree.

Additionally, in recent months, the Defense Department impermissibly interfered with Mr. Slahi's access to this Court by confiscating his legal papers for at least six months; counsel for Mr. Slahi have been unable to confirm with him that all legal papers have since been returned.  Around the same time, it also arbitrarily deprived him of personal items that he had long been permitted to have in his cell and that are important to his mental and emotional well-being.  These items include family photos, personalized gifts from former U.S. military prison guards who had become Mr. Slahi's friends, and a computer given to Mr. Slahi by an interrogator.  That computer did not have internet-connection capability; Mr. Slahi uses it to help keep his mind active and recover from the torture he suffered in U.S. custody.  These actions are unjustified and violate Mr. Slahi's rights to a meaningful habeas process and to freedom from unreasonable conditions of confinement.

As Mr. Slahi's thirteenth year of detention without charge grinds on, the Defense Department's failure to provide him with a PRB hearing and the new restrictions it has imposed on him have caused Mr. Slahi's prolonged, indefinite, and unlawful detention to become even more unendurable.

## PROCEDURAL AND FACTUAL BACKGROUND

Mr. Slahi petitioned for habeas relief in March 2005, asserting that his detention and conditions of confinement at Guantánamo were unlawful.  His petition languished for several years, until the Supreme Court decided in *Boumediene v. Bush,* 553 U.S. 723 (2008), that the Suspension Clause protects individuals imprisoned at Guantánamo from arbitrary executive detention.

After holding hearings in 2009, this Court granted Mr. Slahi's habeas petition on April 9, 2010, finding that the AUMF did not authorize Mr. Slahi's detention.  *See Salahi v. Obama*, 710

F. Supp. 2d 1 (D.D.C. 2010), *vacated and remanded*, 625 F.3d 745 (D.C. Cir. 2010).  The Court

found that the government had failed to show that Mr. Slahi was "part of" al-Qaida at the time of

his capture, and concluded that "evidence in this record cannot possibly be stretched far enough"

to support a finding that Mr. Slahi provided material support to forces hostile to the United

States.  *Id.*, 710 F. Supp. 2d at 5.  On November 5, 2010, the D.C. Circuit vacated and remanded

the decision for additional fact-finding as to whether—in the absence of any evidence that Mr.

Slahi received or executed orders or directions from al-Qaida—he could nonetheless be deemed

"part of" al-Qaida at the time of his capture.  *Salahi v. Obama*, 625 F.3d 745, 752 (D.C. Cir.

2010).  Mr. Slahi's habeas petition challenging whether he is subject to AUMF detention remains

pending before this Court.

Over four years ago, President Obama issued Executive Order 13567, which recognizes

that "continued law of war detention" is unwarranted when it is not "necessary to protect against

a significant threat to the security of the United States."  Exec. Order No. 13,567 § 2, 76 Fed.

Reg. 13,277 (March 7, 2011) ("Exec. Order 13567").  Accordingly, the Executive Order requires

the Department of Defense to implement a periodic review process to determine whether

detainees held pursuant to claimed AUMF authority at Guantánamo Bay should, in fact, be

detained.  Exec. Order 13567 § 2.  The Executive Order specifies that "[f]or each detainee, an

initial review shall commence as soon as possible but no later than 1 year from the date of this

order."  *Id.* § 3(a).  Three years ago, the Department of Defense finally implemented the

Executive Order through the creation of Periodic Review Boards charged with making the

determination Executive Order 13567 requires.  The Periodic Review Secretariat sent an email to

all habeas counsel, informing them of the PRB process on July 19, 2013.  Declaration of Nancy

Hollander, dated June 9, 2015 ("Hollander Dec."), ¶ 5.  On October 9, 2013, the Department of

Defense notified the public that the PRB process was underway, and began holding hearings on

November 20, 2013.  To date, Mr. Slahi has received no notification of a PRB hearing date in his

case, despite his counsel's repeated requests that he promptly receive one.  Hollander Dec. ¶¶ 6–

11 (detailing requests made since 2013).

Mr. Slahi and his counsel have reason to believe that the Defense Department's ongoing

refusal to comply with the PRB requirement is aimed at prolonging Mr. Slahi's detention for the

purpose of interrogation.  Hollander Dec. ¶ 16.  During habeas proceedings in August 2009,

counsel for Mr. Slahi discovered that several weeks before the hearing, Defense Department

interrogators had questioned Mr. Slahi regarding documents that the Justice Department had

recently identified as exhibits it intended to use against Mr. Slahi.  Hollander Dec., Ex. 8

(Habeas Hr'g Tr. 301–304, Aug. 27, 2009).  After Mr. Slahi's counsel objected, the Court

ordered "that there is to be no interrogation of Mr. Salahi by anybody in the United States

government, Defense Department, CIA, FBI, anybody, while these proceedings are going

forward." *Id*. at 304.  The Court made clear that its order was in effect "until further order of the

Court." *Id*.  The Court has not rescinded or modified the order, and it remains in effect.  *Cf.*

Hollander Dec. Ex. 9 (filed under seal) (supporting Mr. Slahi's and his counsel's belief that the

government seeks to interrogate Mr. Slahi).

In recent months, the Defense Department has interfered with Mr. Slahi's access to this

Court and has imposed harsh and arbitrary conditions of confinement without any explanation.

Beginning in approximately October 2014 and for at least six months, Defense Department

personnel confiscated all of Mr. Slahi's legal papers, including court filings and strategy notes;

Mr. Slahi's counsel have not been able to confirm that these materials have been returned.

Hollander Dec. ¶ 18.  At the same time, the Defense Department deprived Mr. Slahi of his

computer. *Id.* ¶ 19.  That computer, which does not have internet-connection capability, was given to Mr. Slahi by an interrogator several years ago.  Having the computer has helped Mr. Slahi to keep his mind active and try to recover from his past torture by the United States.  *Id.* That torture and abuse is described in detail in Mr. Slahi's book, *Guantánamo Diary*.  *Id.* and Hollander Dec., Ex. 7.  Prison officials also confiscated from Mr. Slahi photographs of his family, his books, and the personalized gifts he received over the years from prison guards who became his friends.  Hollander Dec. ¶¶ 17, 20-21.

The loss of these materials has harmed Mr. Slahi's mental and emotional well-being, adding to his feelings of depression and his growing despair at his indefinite and unlawful detention.  *Id.* ¶ 22.

## ARGUMENT

### I.     THE DEFENSE DEPARTMENT MUST PROVIDE MR. SLAHI WITH THE REQUIRED PRB PROCESS.

The Defense Department's failure to provide Mr. Slahi with a PRB hearing violates Executive Order 13567, Department of Defense Directive-Type Memorandum 12-005, the Constitution, the AUMF, and international law.  The Department's detention of Mr. Slahi under claimed AUMF authority—even assuming *arguendo* it was initially lawful, which Mr. Slahi maintains it was not—is therefore rendered independently unlawful so long as it deprives Mr. Slahi of the mandatory PRB process to determine whether he should continue to be detained because he poses a significant threat to the security of the United States.  Thus, in addition to and separate from this Court's adjudication of Mr. Slahi's ongoing challenge to the legality of his detention, the Court should exercise its broad authority under 28 U.S.C. § 2241 and the

Suspension Clause to order the Defense Department to meet its obligation to provide Mr. Slahi with a PRB hearing.[3]

Once Mr. Slahi is provided with a PRB hearing, he will demonstrate that his continued detention is clearly unwarranted. *See* Hollander Dec. ¶¶ 13–14. He poses no threat to the security of the United States, and his detention is thus in no way necessary under the terms of Executive Order 13567. Mr. Slahi will also demonstrate that he can safely return to Mauritania and resume his life there. *Id.* ¶ 15. Mr. Slahi has been prevented from living with and working to support his family for nearly thirteen years; he should be afforded his right to a PRB without delay.

### A. This Court Has Jurisdiction to Order the Defense Department to Provide Mr. Slahi a PRB Hearing.

The D.C. Circuit has made clear that the federal courts retain broad habeas jurisdiction over challenges to unlawful detention at Guantánamo, including the authority to issue remedial orders that extend beyond immediate release. The "proper subject of statutory habeas" under 28 U.S.C. § 2241 extends well beyond the mere fact or duration of detention. *Aamer v. Obama*, 742

---

[3] As Mr. Slahi argues separately in his ongoing habeas proceeding before this Court, the Defense Department never had any legal basis to detain him under the AUMF (or any other authority), and certainly has no such basis at this time. Mr. Slahi was not captured in the context of any armed conflict—international or non-international—and the laws of armed conflict do not, therefore, authorize his detention. Relatedly, he has never engaged in hostilities against the United States and his detention has never been authorized under the AUMF because he was not "part of" and did not provide "substantial" support to al-Qaida, the Taliban, or an associated force. *See Salahi v. Obama*, 710 F. Supp. 2d 1, 4 (D.D.C.), *vacated and remanded*, 625 F.3d 745 (D.C. Cir. 2010); (remanding question of whether Mr. Slahi was "part of" al-Qaida); *see also Hussain v. Obama,* 134 S. Ct. 1621, 1622 (2014) (Breyer, J., concurring in denial of certiorari) (noting that the Supreme Court has never held that the AUMF and the Constitution permit the prolonged and indefinite detention of individuals who never fought the United States in Afghanistan); *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (stating in a case involving an enemy soldier captured on a battlefield in Afghanistan, "[i]f the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, [the] understanding [that detention is authorized for the duration of hostilities] may unravel.").

F.3d 1023, 1030 (D.C. Cir. 2014) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009)).  Habeas is not "'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose.'"  *Boumediene*, 553 U.S. at 780 (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).  Because "'[h]abeas is at its core a remedy for unlawful executive detention,'" the statute encompasses any challenge where a "petitioner contends that some aspect of his confinement has deprived him of a right to which he is entitled while in custody."  *Aamer*, 742 F.3d at 1036 (quoting *Munaf v. Geren*, 553 U.S. 674, 693 (2008)).  The Suspension Clause likewise protects prisoners' ability to challenge to the legality of their detention.  *See Boumediene*, 553 U.S. at 771.

Mr. Slahi's show-cause motion falls squarely within this Court's habeas jurisdiction: he seeks an order requiring his jailer to meet its legal obligation to provide him with a PRB hearing so that he can demonstrate that the Executive Order requires his release.  Therefore, Mr. Slahi's "essential claim is that his custody in some way violates the law, and he may employ the writ to remedy such illegality."  *Aamer*, 742 F.3d at 1036.  Courts have long reviewed the legal effect of executive directives under the habeas statute.  *See, e.g.*, *In re Neagle*, 135 U.S. 1 (1890) (executive directive issued by the Attorney General was a "law of the United States" under the habeas corpus statute).  Constitutional challenges to a delay in holding a required hearing are similarly reviewable under the statute.  *See Sutherland v. McCall*, 709 F.2d 730, 732 (D.C. Cir. 1983) (habeas relief available when delay in providing parole revocation hearing unreasonable and prejudicial).  There is no question that this Court can review the requirements for lawful detention under the AUMF.

**B.  The Defense Department's Continued Detention of Mr. Slahi Without Providing Him a PRB Hearing is Unlawful.**

Mr. Slahi does not concede that the Defense Department has any authority to detain him under the AUMF, nor has any court so held.  But to the extent the Defense Department purports to detain Mr. Slahi under claimed AUMF authority, it is legally obligated to provide him with a PRB hearing.  Yet three years have passed since the Executive Order's deadline for Mr. Slahi's initial PRB review.  And despite Mr. Slahi's repeated requests, the Defense Department has not provided him with the mandated PRB process—to the contrary, it has refused even to notify him of any date by which it will comply with its obligations.  Hollander Dec. ¶¶ 6–11 (detailing repeated requests to the Periodic Review Secretariat for a hearing date for Mr. Slahi).

**i.  The Defense Department's Failure to Provide a PRB Violates the Executive Order.**

Executive Order 13567 has the force and effect of binding law, and the Defense Department is not free to disregard it.  The Executive Order has the force of law because it was issued pursuant to the President's powers and in accordance with a statutory mandate: the AUMF, Pub. L. No. 107-40.  *See Ass'n for Women in Science v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977) (Executive Order is to be "accorded the force and effect of a statute" when it has a "distinct statutory foundation"); *Am. Fed'n of Gov't Emp., AFL-CIO v. Freeman*, 498 F. Supp. 651, 658 (D.D.C. 1980) ("[A]n Executive Order, if issued pursuant to legitimate Presidential authority, would be accorded the force and effect given to a statute enacted by Congress."); *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974) (concluding that valid Executive Order "may create rights protected against inconsistent state laws through the Supremacy Clause").

The Executive Order sets forth requirements mandating that the Defense Department justify continued detention of Mr. Slahi and Guantánamo prisoners like him.  It recognizes that "continued law of war detention" is unwarranted when it is not "necessary to protect against a significant threat to the security of the United States."  Exec. Order 13567 § 2.  It requires the Department of Defense to implement a periodic review process to determine whether detainees held pursuant to claimed AUMF authority at Guantánamo Bay should, in fact, be detained.  *Id.* It specifies strict time limits for the review process, mandating that "[f]or each detainee, an initial review shall commence as soon as possible but no later than 1 year from the date of this order." *Id.* § 3(a).  And once the PRB process results in a determination of whether detention is warranted under the AUMF, the Executive Order requires that "the Secretaries of State and Defense shall be responsible for ensuring that vigorous efforts are undertaken to identify a suitable transfer location" for any detainee that "does not meet the standard in section 2 of this order."  *Id.* § 4(a).

The Defense Department's flouting of the legal requirements set forth in the Executive Order renders Mr. Slahi's "custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  Executive Orders are "the most important type of 'Presidential legislation,'" John E. Noyes, *Executive Orders, Presidential Intent, and Private Rights of Action*, 59 Tex. L. Rev. 837, 839 (1981); even lesser executive directives can constitute a "law of the United States" under the habeas statute.  *See In re Neagle*, 135 U.S. at 67–8, 75–76 (executive directive issued by the Attorney General was a "law of the United States" under the habeas corpus statute).  Under the Order's mandate, Mr. Slahi's initial review was required to commence by March 7, 2012. Exec. Order 13567  § 3(a).  More than three years later, the

Defense Department has yet to even schedule Mr. Slahi's initial PRB hearing, despite his

counsel's repeated requests that it do so.  Hollander Dec. ¶¶ 6–11.  Habeas relief is warranted.

> ii.   **The Defense Department's Failure to Provide a Mandatory PRB Hearing Violates the Suspension and Due Process Clauses of the Constitution.**

The Department's failure to provide Mr. Slahi with the PRB process violates the

Suspension and Due Process Clauses because it bars Mr. Slahi from receiving meaningful review

of his continued detention.[4]

The Suspension Clause entitles Mr. Slahi to a "meaningful opportunity to demonstrate

that he is being held pursuant to the erroneous application or interpretation of relevant law."

*Boumediene*, 553 U.S. at 779 (quotation marks omitted).  Executive Order 13567 implemented

that constitutional requirement by ordering the Defense Department to assess through the PRB

process whether *continued* detention of Guantánamo prisoners is "warranted" under the AUMF

and the laws of war.  Exec. Order 13567 §§ 2–3.  (This process is separate from and in addition

to Mr. Slahi's entitlement to his pending habeas determination.  Exec. Order 13567 § 1(b).)

Without a PRB hearing, Mr. Slahi cannot demonstrate that his ongoing detention is erroneous

because it does not meet the sole legitimate purpose of continued law of war detention: "to

prevent captured individuals from returning to the field of battle and taking up arms once again."

*Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004); *see also Ali v. Obama*, 736 F.3d 542, 545 (D.C.

Cir. 2013) (the "purpose of military detention is to detain enemy combatants for the duration of

---

[4]  The Court does not need to reach these arguments if it finds that a PRB hearing must be provided under the Executive Order or the AUMF.  *See United States v. Brinson–Scott*, 714 F.3d 616, 621 (D.C. Cir.2013) (courts do "'not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of'" (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))); *Act Now to Stop War & End Racism Coal. v. D.C.*, 905 F. Supp. 2d 317, 347 (D.D.C. 2012) ("When faced with a broad constitutional challenge, a court should try to resolve the issue on narrower grounds if possible.").

hostilities so as to keep them off the battlefield").  At a PRB hearing, Mr. Slahi will show that:

(1) he was never detained on "the field of battle"; (2) there is not now and never has been any

basis to detain him under the AUMF because he was not "part of" and did not "substantially"

support al-al-Qaida, the Taliban, or an associated force; and (3) his *continued* detention is

unlawful because he does not pose a threat to the United States.  Depriving Mr. Slahi of access to

the very proceeding established to determine whether his ongoing detention serves any lawful

purpose violates his right to the meaningful review guaranteed by the Suspension Clause.[5]

The Defense Department's failure to provide a PRB hearing also violates the Due Process

Clause, which protects Mr. Slahi's right to be free from arbitrary detention and his liberty

interest in a PRB.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from

imprisonment—from government custody, detention, or other forms of physical restraint—lies at

the heart of the liberty that [Due Process] Clause protects.").  As a threshold matter, that the Due

Process Clause applies to Mr. Slahi's detention follows from the Supreme Court's guidance in

*Boumediene v. Bush*.  In that case, the Court explained that the test for extraterritorial application

of the Constitution is a functional one, and highly context-specific.  It asks, in essence, whether

judicial enforcement of the right at issue would be "impracticable and anomalous."  *Boumediene*,

553 U.S. at 759-60.  In *Boumediene*, the Court directly addressed only the Suspension Clause,

but its rejection of an exclusive focus on territoriality was based on precedents concerning the

extraterritorial scope of several constitutional provisions, and was in no way limited to

considerations specific to the Suspension Clause.  The Court made clear that "questions of

extraterritoriality turn on objective factors and practical concerns, not formalism."  *Id.* at 764.

---

[5]  Indeed, if Executive Order 13567 had not established the PRB process and review, this Court
would be required under the Suspension Clause to conduct an equivalent review.

Mr. Slahi's right under the Due Process Clause to be free from indefinite arbitrary detention satisfies the same objective and practical criteria the Court considered in *Boumediene*. Allowing him to raise his due process right to a PRB hearing would add nothing, or virtually nothing, to the economic and procedural burdens that the Defense Department already faces by virtue of his undeniable right to habeas corpus.  Nor would recognition of Mr. Slahi's due process right raise the specter of interference with a military mission or "friction with the host government." *Id.* at 770.  The United States exercises "plenary control" over Guantánamo, a "secure prison facility located on an isolated and heavily fortified military base," where it is "answerable to no other sovereign for its acts." *Id.*; *cf. Al Maqaleh v. Gates*, 605 F.3d 84, 97–99 (D.C. Cir. 2010) (rejecting extension of Suspension Clause to Bagram Airfield in Afghanistan, because, unlike Guantánamo, "all of the attributes of a facility exposed to the vagaries of war are present in Bagram," and detention was within sovereign territory of Afghanistan).  Accordingly, the D.C. Circuit has considered numerous constitutional claims in the context of Guantánamo habeas litigation, assuming without deciding that additional constitutional rights may be asserted by prisoners detained there.  *See Al Bahlul v. United States*, 767 F.3d 1, 18 (D.C. Cir. 2014) (en banc) (assuming that *Ex Post Facto* Clause applies at Guantánamo); *Aamer*, 742 F.3d at 1039 (assuming "constitutional right to be free from unwanted medical treatment extends to nonresident aliens detained at Guantánamo"); *see also Kiyemba v. Obama*, 561 F.3d 509, 514 n.4 (D.C. Cir. 2009).  In the most recent decision to address the extension of constitutional provisions to prisoners at Guantánamo, a majority of the en banc court would have held that the Ex Post Facto Clause applied if the government had not obviated the question by conceding the Clause's applicability. *See Al Bahlul*, 767 F.3d at 18 n.9.[6]

---

[6]  Unnecessarily broad language from one previous D.C. Circuit panel decision suggested that

Mr. Slahi's Due Process Clause right to be free of arbitrary detention protects his liberty

interest in a mandatory PRB.  When the government creates a process for determining release

eligibility, "use of explicitly mandatory language, in connection with the establishment of

specified substantive predicates to limit discretion, forces a conclusion that the state has created a

liberty interest." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989) (internal

quotation marks omitted).  The Executive Order creates a liberty interest by establishing a

process, *see supra* Section B(i), and a specific standard for determining whether detention is

warranted, and using explicitly mandatory language to describe the result of determinations

under that standard.  *See* Exec. Order 13567 § 4(a) ("[T]he Secretaries of State and Defense *shall*

be responsible for ensuring that vigorous efforts are undertaken to identify a suitable transfer

location" for any detainee that "does not meet the standard in section 2 of this order.") (emphasis

added).  The Supreme Court has recognized that this language creates a liberty interest protected

under the Due Process Clause.  *See Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987) (liberty

interest created where the government "uses mandatory language ('shall') to create a

presumption that parole release will be granted when the designated findings are made"

(quotation and alteration marks omitted)).

The Defense Department's promulgation of guidelines to interpret the specified

substantive predicate established by the Executive Order confirms Mr. Slahi's liberty interest in a

PRB.  PRB release determinations are not left to the unfettered discretion of decisionmakers.

Instead, the Department has laid out exhaustive criteria for determining whether detention is

---

the Due Process Clause does not apply to Guantánamo detainees, *see Kiyemba v. Obama*, 555
F.3d 1022, 1026-27 (D.C. Cir. 2009), *vacated and remanded*, 130 S. Ct. 1235 (2010) (per
curiam), *reinstated on remand*, 605 F.3d 1046 (D.C. Cir. 2010) (per curiam), *cert. denied*, 131 S.
Ct. 1631 (2011).  But as discussed above, subsequent decisions have not relied on that overly
broad language, and have correctly assumed that multiple constitutional protections, including
the Due Process Clause, do apply.

authorized under the AUMF.  *See* Directive-Type Memorandum (DTM) 12-005, "Implementing

Guidelines for Periodic Review of Detainees Held at Guantánamo Bay per Executive Order

13567" (May 9, 2012) (Incorporating Change 2, Nov. 4, 2013) (identifying numerous factors to

be considered as part of PRB determination).  These factors cabin and guide the PRB's decision-

making, creating a presumption of release if they are met that is sufficient to trigger the

protections of the Due Process Clause.  *See Bd. of Pardons*, 482 U.S. at 374 (liberty interest

existed where statute "sets forth a list of 14 factors (including one catchall factor permitting the

Nebraska Board to consider other information it deems relevant) that the Board must consider in

reaching a decision").

Moreover, even if the President and Defense Department had not created a liberty interest

by establishing the PRB process, the Due Process Clause would *still* require that Mr. Slahi be

provided with periodic review—administrative or judicial—of whether his continued, preventive

detention was warranted.  That is because the Supreme Court has authorized "preventive

detention based on dangerousness *only* when limited to specially dangerous individuals and

subject to strong procedural protections."  *Zadvydas*, 533 U.S. at 691 (emphasis added).  Yet Mr.

Slahi is currently deprived of a proceeding in which he can demonstrate that his continued

detention is unwarranted because he poses no threat.  *Cf. Kansas v. Hendricks*, 521 U.S. 346, 364

(1997) (upholding noncriminal detention where "commitment under the Act is only *potentially*

indefinite" because judicial review of detainee dangerousness is required each year (emphasis in

original)).

The Defense Department's continuing unlawful deprivation of Mr. Slahi's right to a PRB

hearing is, therefore, "in violation of the Constitution." 28 U.S.C. § 2241(c)(3).  Habeas relief is

warranted.

### iii.   The Defense Department's Failure to Provide a Mandatory PRB Hearing Violates the AUMF and International Law.

The Defense Department's ongoing detention of Mr. Slahi without providing him with the PRB process renders his detention *ultra vires* under the AUMF because the AUMF *itself requires* that detention be subject to periodic review in accordance with the laws of war, even when that detention was initially authorized.[7]   The Supreme Court made clear in *Hamdi* that the AUMF must be interpreted "based on longstanding law-of-war principles."  *Hamdi*, 542 U.S. at 521.   And the government has repeatedly asserted that the AUMF is in fact "informed by the laws of war," which include the Geneva Conventions.  *See, e.g.*, Brief of Respondents-Appellees at 24-25, *Al Warafi v. Obama*, No. 11-5276 (D.C. Cir. Feb. 12, 2012); Resp.'s Mem. Regarding Gov't Detention Authority Relative to Detainees at Guantánamo Bay at *1, *In Re: Guantánamo Bay Litigation*, No. 08-442 (D.D.C. Mar. 13, 2009) ("Principles derived from law-of-war rules governing international armed conflicts . . . must inform the interpretation of the detention authority Congress has authorized for the current armed conflict.").   Consistent with longstanding law-of-war principles, the AUMF cannot authorize the continued detention of individuals like Mr. Slahi without periodic review to determine whether that detention is necessary.[8]

---

[7]  Mr. Slahi makes this argument without conceding that any authority exists under the AUMF or the laws of war for his initial detention.  *Supra*, fn. 3.  For the purposes of this motion, Mr. Slahi maintains that assuming that this authority exists, the same law of war principles that the government relies on as support for his initial detention under the AUMF (i.e., as "part of" al Qaeda), require review to determine whether Mr. Slahi should continue to be detained today under the AUMF based on an assessment of whether he poses a significant threat to the United States.

[8]  This interpretation is, moreover, required to avoid the serious constitutional questions that would be raised under the Suspension and Due Process Clauses if the AUMF were interpreted to authorize Mr. Slahi's indefinite detention without any process by which he can demonstrate that his detention does not bear a reasonable relation to its asserted purpose of preventing a continued

There are two principal sources of law-of-war authority for the detention—and review of detention—of individuals in an armed conflict: the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Third Geneva Convention"), and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Fourth Geneva Convention"); *see also* Int'l Comm. of the Red Cross, Commentary to the IV Geneva Convention 51 (Jean S. Pictet ed., 1958) ("Every person in enemy hands must have some status under international law: he is either a prisoner of war and, as such, covered by the Third Convention, [or] a civilian covered by the Fourth Convention …. There is no intermediate status; nobody in enemy hands can be outside the law."). The Defense Department has never claimed that the Third Geneva Convention applies to Mr. Slahi, nor could it, because Mr. Slahi is not alleged to be a uniformed member of a regular armed force of a nation state (as would be required for the Third Convention to apply) and the Pentagon has never accorded him prisoner-of-war status. Therefore, to the extent that the AUMF authorizes Mr. Slahi's detention at all, that detention must be informed by the requirements of the Fourth Geneva Convention, which covers individuals who are not combatants, including unprivileged belligerents. *See* U.S. Army Operational Law Handbook 20 (2013) ("Under the Geneva Conventions and AP I, civilians are those whom [sic] are not members of a nation's armed forces."); U.S. Army Field Manual 27–10, The Law of Land Warfare ¶ 73 (July 1956).

It is black-letter international law that the Fourth Geneva Convention permits law-of-war detention "only if the security of the Detaining Power makes it absolutely necessary." Geneva

---

significant security threat. *See supra* Section I.B.ii; *Zadvydas,* 533 U.S. at 689–90 (holding that because a "statute permitting indefinite detention of an alien would raise a serious constitutional problem," interpretation authorizing such detention must be rejected unless no other construction is "fairly possible") (quotation marks omitted).

IV, art. 42.  Under the Fourth Geneva Contention, detention authority does not last indefinitely *even if the armed conflict itself continues*; a detainee must be released "as soon as the reasons which necessitated his internment no longer exist."  *Id.* art. 132.  To ensure that individuals are not subjected to unwarranted detention, the Fourth Geneva Convention requires at least twice-annual review by a court or board.  *Id.* art. 43(d); *see also* Int'l Comm. of the Red Cross, Commentary: IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War 260-61 (Jean S. Pictet ed., 1958) (describing requirement that the court or administrative board be independent); Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War On Terrorism, 118 Harv. L. Rev. 2047, 2124-25 (2005) (law-of-war detention should be read to require an individualized determination of the likelihood of returning to battle).

Thus, consistent with and implementing the Fourth Geneva Convention's review requirements, the Executive Order mandates periodic review to determine whether law-of-war detention under the AUMF is warranted to protect against a significant threat to the security of the United States.  *See* Exec. Order 13567 § 2.  The Defense Department's failure to provide Mr. Slahi this review *four years* after the President ordered it violates both the AUMF and the law of war principles on which it rests.[9]

The Defense Department's failure to provide Mr. Slahi a PRB hearing is especially troubling for a separate and additional reason.  Recently, the government has taken actions suggesting that the Defense Department's failure to provide a hearing is motivated by a desire to

---

[9]  The law of war principles governing non-international armed conflicts (such as conflict between a state and a non-state actor) likewise demand periodic review of the continuing basis for detention in that context.  *Cf.* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-international Armed Conflicts art. 2, adopted June 8, 1977, 1125 U.N.T.S. 609 (discussing length of detention in a non-international armed conflict); 1 Jean-Marie Henckaerts & Louise Doswald-Beck, Int'l Comm. of the Red Cross, Customary International Humanitarian Law, 451 (2005) (in context of non-international armed conflict, once detention is no longer warranted, states must avoid delays in release).

subject Mr. Slahi to further interrogation—whether about himself or about one or more of his

fellow prisoners.  *See* Hollander Dec. ¶ 16 and Ex. 9.  Any such action is a stark violation of the

AUMF and the law of war because, as the Supreme Court has made clear, "indefinite detention

for the purpose of interrogation is not authorized" by the AUMF.  *Hamdi*, 542 U.S. at 521. It is

also in violation of the existing order of this Court that the government no longer interrogate Mr.

Slahi.  Hollander Dec., Ex. 8 (Habeas Hr'g Tr. 301–304, Aug. 27, 2009).

## II.    THE DEFENSE DEPARTMENT MUST CEASE INTERFERING WITH MR. SLAHI'S ACCESS TO THIS COURT.

The habeas statute authorizes relief when the government impedes a detained individual's

ability to access the courts by preventing access to legal materials, as it has done in Mr. Slahi's

case.  That is because the Great Writ requires the Judiciary to ensure that a prisoner's access to

the courts is "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977).

For prisoners, "access to legal materials [i]s a corollary of the constitutional right of access to the

courts." *Hudson v. Palmer*, 468 U.S. 517, 547 (1984).  Without those legal materials, a prisoner

cannot avail himself of "the privilege of habeas corpus[, which] entitles the prisoner to a

meaningful opportunity to demonstrate that he is being held pursuant to the erroneous

application or interpretation of relevant law." *Boumediene*, 553 U.S. at 779 (quotation marks

omitted).  Confiscation of legal materials therefore unreasonably curtails the right of access to

the courts, *see, e.g.*, *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (confiscation of

legal materials from prisoners constitutes unreasonable interference with access to courts), and

habeas is the appropriate remedy, s*ee Aamer*, 742 F.3d at 1036 ("Where the specific detention

abridges federally protected interests—by  . . . impeding his access to the courts, and so on—it is

an unlawful detention *and habeas lies to release the petitioner therefrom*." (internal quotation

marks omitted) (emphasis added)).

Interference with legal correspondence also impedes access to counsel, without which "access to the Court means nothing." *Al–Joudi v. Bush*, 406 F.Supp.2d 13, 22 (D.D.C. 2005). As courts have repeatedly found, detainees at Guantánamo "cannot be expected to exercise [the right to habeas corpus] without the assistance of counsel." *Al Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004). The right to counsel and the right to habeas are therefore "inseparable concepts and must run together." *In re Guantánamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8, 15 (D.D.C. 2012). And "[i]n order to properly represent habeas Petitioners, their counsel must have access to them, [and] must be able to communicate with them . . . ." *Husayn v. Gates*, 588 F. Supp. 2d 7, 10 (D.D.C. 2008) (quotation and alteration marks omitted). Courts have rejected government efforts to intrude on attorney-client communication in the course of Guantánamo habeas litigation because "[t]he privacy of communications between attorney and client is crucial to this relationship." *Al Odah*, 346 F. Supp. 2d at 10.

Under the Protective Order applicable to this case, the Defense Department is prohibited from reading or interfering with qualifying legal mail counsel send to detainees. *See In re Guantánamo Bay Detainee Litig.*, 577 F. Supp. 2d 143, 158 (D.D.C. 2008), *amended*, No. 08-0442 (TFH), 2009 WL 2143732 (D.D.C. July 10, 2009), *amended in part*, 634 F. Supp. 2d 17 (D.D.C. 2009), *adhered to sub nom. In re Guantánamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8 (D.D.C. 2012). Instead the privilege team may only, upon a letter's arrival, "search the contents for prohibited physical contraband." *Id.* Qualifying legal mail must then be delivered to the detainee. *See id.*

Despite the clear legal prohibition against depriving a prisoner of legal materials and access to counsel, in approximately October 2014, Mr. Slahi's jailors confiscated all his legal

papers. Hollander Dec. ¶ 18. Although military lawyers informed both Mr. Slahi and his

counsel that the documents would be returned, as of counsel's last in-person visit with Mr. Slahi

in April 2015, it had still deprived him of many of them. *Id.* Respondents' counsel recently

represented that Mr. Slahi had all his legal papers, but his counsel have not been able to confirm

that with Mr. Slahi himself. *Id.* The Defense Department's interference with Mr. Slahi's legal

documents unlawfully impedes his right to seek habeas review in this Court because he cannot

meaningfully participate in this proceeding without access to his legal, privileged and

confidential attorney-client and work product documents. And his attorneys cannot effectively

represent Mr. Slahi if their privileged communications with him are subject to arbitrary seizure.

There can be no justification for the Defense Department's interference with Mr. Slahi's access

to this Court and his attorney-client relationship with his counsel. Habeas relief is warranted.

## III.   THE DEFENSE DEPARTMENT MUST CEASE IMPOSING ARBITRARY RESTRICTIONS ON MR. SLAHI'S CONDITIONS OF CONFINEMENT.

The D.C. Circuit has made clear that individuals detained at Guantánamo may bring

challenges in habeas to their conditions of confinement. *See Hatim v. Obama*, 760 F.3d 54, 58

(D.C. Cir. 2014); *Aamer*, 742 F.3d at 1036. Because the government may not introduce arbitrary

or unreasonable restrictions on prisoners' rights, habeas courts must evaluate "(1) whether there

is a 'valid, rational connection between the prison regulation and the legitimate governmental

interest put forward to justify it,'; (2) 'whether there are alternative means of exercising the right

that remain open to prison inmates,'; (3) 'the impact accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of prison

resources generally,'; and (4) 'the absence of ready alternatives' to the regulation." *Hatim*, 760

F.3d at 59 (quoting *Turner v. Safley*, 482 U.S. 78, 89–90 (1987)). "[T]he *Turner* . . .

reasonableness standard is not toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)

(internal quotations omitted).  "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."  *Beard v. Banks*, 548 U.S. 521, 535 (2006).

Yet, in approximately October 2014, the Defense Department imposed arbitrary new restrictions on Mr. Slahi's detention conditions by depriving him without notice or explanation of the only comforts he has possessed over the course of his continuing ordeal.  Specifically, the Defense Department took from Mr. Slahi's cell his computer—which cannot connect to the Internet and was given to him by an interrogator several years ago.  Hollander Dec. ¶ 19.  Use of that computer helps Mr. Slahi to keep his mind occupied and recover from the torture to which the United States subjected him.  *Id.*  Defense Department personnel also took from Mr. Slahi his photographs of his family, his books, and the personalized gifts he received over the years from prison guards.  Access to these items is vital to Mr. Slahi's mental and emotional well-being, and he is suffering greatly from their absence.  *See* Hollander Dec. ¶¶ 19–22 (describing these deprivations and their negative consequences for Mr. Slahi's well-being).  As described above, the deprivation of Mr. Slahi's legal correspondence also prevents him from meaningfully accessing this Court, causing further harm.

These severe restrictions cannot stand because they are arbitrary and bear no reasonable relation to any legitimate government interest.  During his long years of imprisonment at Guantánamo, Mr. Slahi has never had a single disciplinary infraction.  Hollander Dec. ¶ 13.  The Defense Department has provided no explanation for its decision to deprive Mr. Slahi of virtually everything that helped him cope with his prolonged and indefinite detention.

Mr. Slahi has been detained without charge for thirteen years.  He has no indication of when, if ever, he will ever leave Guantánamo.  This Court should order the Defense Department

to cease imposing arbitrary restrictions on Mr. Slahi's right to possess his belongings in his cell, and return the only comforts he possesses in a sea of despair.

## CONCLUSION

For the foregoing reasons, this Court should require the Defense Department to (1) promptly provide Petitioner a hearing before a Periodic Review Board; (2) cease interfering with Petitioner's access to this habeas Court; and (3) cease imposing arbitrary and severe restrictions on Petitioner's conditions of confinement.

Petitioner also respectfully requests a status conference.


Dated: June 10, 2015

Respectfully submitted,


/s/ Hina Shamsi
Hina Shamsi (D.C. Bar. No. MI0071)
Dror Ladin
American Civil Liberties Union Foundation
125 Broad Street, 18th floor
New York, NY 10004
(212) 284-7321
Fax: (212) 549-2654
Email: hshamsi@aclu.org

Nancy Hollander (D.C. Bar No. TX0061)
Freedman Boyd Hollander
Goldberg Urias & Ward, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
(505) 842-9960
Fax: (505) 842-0761
Email: nh@fbdlaw.com

Theresa M. Duncan
515 Granite NW
Albuquerque, NM 87102
(505) 842-5196
Fax: (505) 750-9780
Email: teri@duncanearnest.com

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Telephone: (917) 355-6896
hafetzj@yahoo.com

Linda Moreno
Linda Moreno P.A.
P.O. Box 10985
Tampa, FL 33679
(813) 247-4500
Email: lindamoreno.esquire@gmail.com

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
(202) 457-0800 x1004
Fax: (202) 457-0805
Email: artspitzer@aclu-nca.org

*Counsel for Petitioner*