**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

MOHAMEDOU OULD SLAHI,

        Petitioner,

          v.

BARACK H. OBAMA,
  President of the United States, <u>et al.</u>,

        Respondents.

Civil Action No. 1:05-cv-569 (RCL)

**RESPONDENTS' OPPOSITION**
**<u>TO PETITIONER'S MOTION TO SHOW CAUSE</u>**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................ 3

I.     Petitioner's Claim for an Immediate PRB Hearing Is Unfounded. ................. 8

     A.     Background Regarding the Periodic Review Board ................................... 8

     B.     Petitioner's Claim for Injunctive Relief Related to a PRB Hearing Is Not Cognizable in Habeas, and Therefore Barred by 28 U.S.C. § 2241(e)(2), Because It Will Not Necessarily Alter the Fact, Duration, or Form of His Detention............................................................................................... 13

     C.     Petitioner Has No Legally Cognizable Right to an Immediate PRB Hearing................................................................................................... 19

         1.     The Executive Order Does Not Create a Private Cause of Action. ...................................................................................................... 19

         2.     Petitioner Does Not Have a Right to a PRB Hearing under Either the Suspension Clause or the Due Process Clause........................ 22

         3.     The Fact that Petitioner Has Not Yet Received a PRB Hearing Is Not a Violation of the AUMF or International Law. ..................... 29

II.     Petitioner Has Not Been Deprived of Any of His Legal Materials. ................. 37

III.     Petitioner Does Not Have a Legally Cognizable Claim to Challenge the Purported "Arbitrary Restrictions" on Certain "Comfort" Items............... 39

CONCLUSION ........................................................................................................ 42

## TABLE OF AUTHORITIES

**CASES**

Aamer v. Obama,
    742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................... 13, 39

Abbott v. Abbott,
    560 U.S. 1 (2010) .................................................................................................................. 31

Ahjam v. Obama,
    37 F. Supp. 3d 273 (D.D.C. 2014) .................................................................................. 21, 24

Air Transp. Ass'n of Am. v. FAA,
    169 F.3d 1 (D.C. Cir. 1999) ................................................................................................ 21

Al Bahlul v. United States,
    767 F.3d 1 (D.C. Cir. 2014) ................................................................................................ 27

Al Odah v. United States,
    62 F. Supp. 2d 101 (D.D.C. 2014) ...................................................................................... 26

Al Warafi v. Obama,
    704 F. Supp. 2d 32 (D.D.C. 2010), aff'd  in part and remanded on other
    grounds by 409 F. App'x 360 (D.C. Cir. 2011), ................................................................ 26

Al Warafi v. Obama,
    716 F.3d 627 (D.C. Cir. 2013) ............................................................................................ 35

Al Wirghi v. Obama,
    54 F. Supp. 3d 44 (D.D.C. 2014) ........................................................................................ 28

Al-Bihani v. Obama,
    590 F.3d 866 (D.C. Cir. 2010) ............................................................................................ 25

Al-Madhwani v. Obama,
    642 F.3d 1071 (D.C. Cir. 2011) ............................................................................. 27

Al-Zahrani v. Rodriguez,
    669 F.3d 315 (D.C. Cir. 2012) ............................................................................... 13

Ali v. Obama,
    736 F.3d 542 (D.C. Cir. 2013) ................................................................... 25, 33, 36

Alliance for Natural Health v. Sebelius,
    775 F. Supp. 2d 114 (D.D.C. 2011) ...................................................................... 22

Ameziane v. Obama,
    58 F. Supp. 3d 99 (D.D.C. 2014) ........................................................................... 28

Anam v. Obama,
    696 F. Supp. 2d 1 (D.D.C. 2010) ........................................................................... 26

Awad v. Obama,
    608 F.3d 1 (D.C. Cir. 2010) ................................................................................... 25

Bell v. Wolfish,
    441 U.S. 520 (1979) ................................................................................................ 40

Bostan v. Obama,
    674 F. Supp. 2d 9 (D.D.C. 2009) ..................................................................... 28, 29

Boumediene v. Bush,
    553 U.S. 723 (2008) ......................................................................................... passim

Chai v. Carroll,
    48 F.3d 1331 (4th Cir. 1995) ................................................................................. 20

Chatman-Bey v. Thornburgh,
  864 F.2d 804 (D.C. Cir. 1988) ............................................................................................ 16

Communities Against Runway Expansion, Inc. v. FAA,
  355 F.3d 678 (D.C. Cir. 2004) ............................................................................................ 21

Davis v. U.S. Sentencing Commission,
  716 F.3d 660 (D.C. Cir. 2013) ....................................................................................... 15, 16

Defenders of Wildlife v. Jackson,
  791 F. Supp. 2d 96 (D.D.C. 2011) ...................................................................................... 22

Department of Navy v. Egan,
  484 U.S. 518 (1988) ............................................................................................................ 25

Dhiab v. Obama,
  -- F. Supp. 3d --, 2014 WL 5795483 (D.D.C. Nov. 7, 2014) ........................................... 40-41

Facchiano Constr. Co. v. U.S. Dep't of Labor,
  987 F.2d 206 (3d Cir. 1993) ............................................................................................... 20

Fla. Bankers Ass'n v. U.S. Dep't of Treasury,
  19 F. Supp. 3d 111 (D.D.C. 2014) ...................................................................................... 22

Gherebi v. Obama,
  609 F. Supp. 2d 43 (D.D.C. 2009) ...................................................................................... 34

Hamdi v. Rumsfeld,
  542 U.S. 507 (2004) ...................................................................................................... 24, 36

Hamlily v. Obama,
  616 F. Supp. 2d 63 (D.D.C. 2009) ...................................................................................... 34

Hatim v. Obama,
  760 F.3d 54 (D.C. Cir. 2014) .............................................................................................. 39

iv

Helicopter Ass'n Int'l, Inc. v. FAA,
    722 F.3d 430 (D.C. Cir. 2013) ............................................................................. 21

Hernandez v. Stephens,
    No. 3:13-1391, 2014 WL 667373 (N.D. Tex. Feb. 20, 2014) ................................................. 16

In re Long-Distance Telephone Serv. Fed. Excise Tax Refund Litig.,
    751 F.3d 629 (D.C. Cir. 2014) ............................................................................. 18

In re Surface Mining Regulation Litig.,
    627 F.2d 1346 (D.C. Cir. 1980) ......................................................................... 19, 20

Indep. Meat Packers Ass'n v. Butz,
    526 F.2d 228 (8th Cir. 1975) ........................................................................... 19, 20

Kiyemba v. Obama,
    555 F.3d 1022 (D.C. Cir. 2009), vacated and remanded
    559 U.S. 131 (2010), reinstated 605 F.3d 1046 (D.C. Cir. 2010)........................................... 27

Kiyemba v. Obama,
    561 F.3d 509 (D.C. Cir. 2009) ............................................................................. 13

Ludecke v. Watkins,
    335 U.S. 160 (1948)......................................................................................... 25

McGregor v. Greer,
    748 F. Supp. 881 (D.D.C. 1990) ........................................................................... 18

Meyer v. Bush,
    981 F.2d 1288 (D.C. 1992) ................................................................................. 21

Mitchell v. United States,
    930 F.2d 893 (Fed. Cir. 1991)............................................................................. 18

Muhammad v. Close,
    540 U.S. 749 (2004) ................................................................................................ 15


Natural Res. Def. Council v. U.S. Dep't of State,
    658 F. Supp. 2d 105 (D.D.C. 2009) ........................................................................ 22


Nettles v. Grounds,
    788 F.3d 992 (9th Cir. 2015) ................................................................................... 16


Norton v. S. Utah Wilderness Alliance,
    542 U.S. 55 (2004) .................................................................................................. 18


Old Dominion Branch No. 496 v. Austin,
    418 U.S. 264 (1974) ................................................................................................ 22


People's Mojahedin Org. of Iran v. Department of State,
    182 F.3d 17 (D.C. Cir. 1999) .................................................................................. 25


Preiser v. Rodriguez,
    411 U.S. 475 (1973) ................................................................................................ 15


Procunier v. Martinez,
    416 U.S. 396 (1974) ................................................................................................ 40


Rabbani v. Obama,
    -- F. Supp. 3d --, 2014 WL 7334117 (D.D.C. 2014) ....................................... 28, 29


Rasul v. Myers,
    563 F.3d 527 (D.C. Cir. 2009) .......................................................................... 28, 29


Razzoli v. Federal Bureau of Prisons,
    230 F.3d 371 (D.C. Cir. 2000) ................................................................................ 16

Salahi v. Obama,
    625 F.3d 745 (D.C. Cir. 2010) ........................................................................... 4, 25

Skinner v. Switzer,
    562 U.S. 521 (2011) ........................................................................................ 14-17

Thornburgh v. Abbott,
    490 U.S. 401 (1989) ............................................................................................. 40

Turner v. Safley,
    482 U.S. 78 (1987) ................................................................................ 3, 39, 40, 41

U.S. Dep't of Health & Human Servs. v. Federal Labor Rel. Auth.,
    844 F.2d 1087 (4th Cir. 1988) ............................................................................. 19

United States v. Torres,
    115 F.3d 1033 (D.C. Cir. 1997) ........................................................................... 28

Utah Ass'n of Counties v. Bush,
    316 F. Supp. 2d 1172 (D. Utah 2004) .................................................................. 20

Wilkinson v. Dotson,
    544 U.S. 74 (2005) .................................................................................... 15, 17, 18

Women's Equity Action League v. Cavazos,
    906 F.2d 742 (D.C. Cir. 1990) ............................................................................. 19


**STATUTES**

5 U.S.C. § 706(1) .................................................................................................... 18
28 U.S.C. § 2241(e)(1) ...................................................................................... 13, 24
28 U.S.C. § 2241(e)(2) ...................................................................................... 13, 18
42 U.S.C. § 1983 .......................................................................................... 14, 16, 17

National Defense Authorization Act for Fiscal Year 2012 § 1021(c)(1),
    112 Pub. L. No. 81, 125 Stat. 1298 (Dec. 31, 2011) ............................................ 36

**U.S. CONSTITUTION**

Art 1., § 9, cl. 2 ................................................................................................ 23

**EXECUTIVE ORDERS**

Executive Order 13492,
     74 Fed. Reg. 4897 (Jan. 22, 2009) .................................................................. 8, 21

Executive Order13567,
     76 Fed. Reg. 13277 (Mar. 7, 2011)............................................................... passim

**OTHER AUTHORITIES**

Genova Convention III Art. 2 ........................................................................... 30
Genova Convention III Art. 3 ....................................................................... 31, 33
Genova Convention IV Art. 43 & 132 ............................................................. 29

Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization
     and the War on Terrorism, 118 Harv. L. Rev. 2047 (2005) .................................... 35

Daniel L. Pines, The Central Intelligence Agency's "Family Jewels":
     Legal Then? Legal Now?, 84 Ind. L.J. 637 (2009)........................................... 20

Guantanamo Review Task Force: Final Report, (Jan. 22, 2010), available at
     http://www.justice.gov/sites/default/files/ag/legacy/2010/06/02/guantanamo-review-final-
     report.pdf................................................................................................... 9

John E. Noyes, Executive Orders, Presidential Intent, and Private Rights of Action,
     59 Tex. L. Rev. 837 (1981)........................................................................ 20

Kevin M. Stack, The Statutory President,
     90 Iowa L. Rev. 539 (2005).......................................................................... 21

U.S. Dep't of Defense Law of War Manual (June 2015),
     http://www.defense.gov/pubs/Law-of-War-Manual-June-2015.pdf ........................ 30, 32-35

U.S. Dep't of Defense News Release No. 709-13 (Oct. 9, 2013),
    http://www.defense.gov/releases/release.aspx?releasedid=16302 ................................. 10, 11

U.S. Dep't of Defense News Release No. NR-559-14 (Nov. 5, 2014),
    http://www.defense.gov/Releases/Release.aspx?ReleasedID=17019 ................................ 12

U.S. Dep't of Defense News Release NR-017-14 (Jan. 9, 2014),
    http://www.defense.gov/releases/release.aspx?releaseid=1647 ................................................ 12

U.S. Dep't of Defense Order, Administrative Review Procedures for  Enemy
  Combatants in the Control of the Department of Defense at
  Guantanamo Bay Cuba  (May 11, 2004),
    http://www.defense.gov/news/May2004/d20040518gtmoreview.pdf .................................... 9

U.S. Dep't of Defense Periodic Review Board Secretariat,
  http://www.prs.mil/reviewinformation/fullreviewpage.aspx ................................................... 12

**INTRODUCTION**

Petitioner Mohamedou Ould Slahi (ISN 760) moves the Court for an order requiring Respondents (1) to provide him with a hearing before a Periodic Review Board (PRB) ahead of other Guantanamo detainees, (2) to cease interfering with his access to this habeas Court by purportedly denying him access to legal materials, and (3) to cease imposing "severe" restrictions on his conditions of confinement by purportedly denying him access to certain "comfort" items.  Petitioner does not present a sound legal basis for any of these claims.

The Executive has already committed to provide Petitioner and other Guantanamo detainees with a PRB hearing.  Petitioner, however, seeks a Court order requiring that his PRB hearing occur immediately because, he claims, the fact that he has not received a more prompt PRB hearing is a violation of the Executive Order establishing the PRB process, the Suspension and Due Process Clauses of the Constitution, the Authorization for Use of Military Force (AUMF), and international law.  Among other things, he argues that the fact that he has not yet received a PRB hearing "bars [him] from receiving meaningful review of his continued detention."  Pet. Mot. at 11.  But Petitioner confuses the meaningful review constitutionally available to him through habeas, as the Supreme Court held in <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008), with the review for discretionary release based on threat-related considerations that the Executive is providing through PRBs.  Notably, Respondents have sought to provide Petitioner with a prompt and meaningful review of his habeas case by seeking an expedited hearing on the merits of his case in October 2012, but Petitioner opposed such a hearing, and his habeas case has remained dormant, at his own choosing, for almost three years now.

Regardless, Petitioner's claim of entitlement to a PRB hearing ahead of other detainees is baseless.  As an initial matter, the Court does not have jurisdiction to issue such an order because the sequencing of an administrative review process that will not necessarily result in Petitioner's release (it only *may* result in a more prompt determination of eligibility for transfer) does not sound in habeas, and this Court lacks jurisdiction over non-habeas claims.  Even if this Court has jurisdiction, Petitioner's claim is without legal merit:  the Executive Order does not create any enforceable legal rights; it is binding precedent in this Circuit that the Due Process Clause does not apply to Guantanamo detainees; an alleged delay in receiving a PRB hearing is unrelated to his right to petition for habeas corpus, and therefore not a violation of the Suspension Clause; and neither the AUMF nor international law require a periodic review of individuals who, like Petitioner, are lawfully detained as part of enemy forces.  At bottom, the relief Petitioner seeks— an order that the Executive provide him with a PRB hearing before other Guantanamo detainees—is also impractical.  Petitioner's argument for why he should receive an immediate PRB hearing is not unique to his circumstances, so every other Guantanamo detainee awaiting a PRB hearing could claim a similar right, and the Executive would still have to sequence hearings such that some detainees get them before others do.

With regard to Petitioner's second claim, Respondents have not deprived Petitioner of any of his legal materials.  In the fall of 2014, Respondents transferred Petitioner from one detention camp to another at Guantanamo.  Like all detainees in his current place of detention, Petitioner is permitted to keep one bin of legal materials in his cell, while all other legal materials

2

are kept in storage until Petitioner requests them.  Thus, Petitioner (who is aware of this policy)

continues to have access to all of his legal materials.

With regard to Petitioner's claim regarding the deprivation of certain "comfort" items,

Petitioner has not made the prima facie showing necessary for any relief because he has not

alleged the deprivation of a right protected by the Constitution, as required by the Supreme

Court's decision in <u>Turner v. Safley</u>, 482 U.S. 78 (1987).  Absent any such allegation,

Petitioner's claim fails because courts traditionally afford significant deference in such matters to

the administrator of a detention facility, and detainees do not have a free-floating right to

challenge each and every decision regarding "comfort items" under a reasonableness test, as

Petitioner suggests.

## PROCEDURAL HISTORY

Petitioner filed his petition for a writ of habeas corpus on March 18, 2005.  <u>See</u> ECF No.

1.  After the Supreme Court decided <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008), this habeas

action proceeded before the Honorable James Robertson.  In addition to the automatic discovery

Petitioner received from Respondents pursuant to Sections I.D.1 and I.E.1 of the governing Case

Management Order (CMO), ECF Nos. 130 & 148, Petitioner also sought further discovery in a

series of motions making dozens of separate requests.  <u>See</u> ECF Nos. 182, 234, 235, 237.  The

Court granted these motions in part, and Respondents produced responsive information.

Subsequently, the Court held a merits hearing on August 27-28, 2009, and December 14-15,

2009, at which Petitioner and his hired expert testified.  The Court received extensive pre- and

post-merits hearing briefing.  See ECF Nos. 247-48, 256-57, 275-78, 299, 304, 309-10.  On

March 19, 2010, the Court granted the writ of habeas corpus.  See ECF No. 319.

 Arguing that the district court had committed a number of legal and factual errors,

Respondents appealed.  See ECF No. 316.  On November 5, 2010, the Court of Appeals

expressed "serious doubt [about] the district court's approach to determining whether an

individual is 'part of' al-Qaida," vacated the judgment for Petitioner, and remanded the case to

the district court for further proceedings.  Salahi v. Obama, 625 F.3d 745, 747 (D.C. Cir. 2010).

In its remand instructions, the Court of Appeals directed the district court to determine, among

other questions, whether Petitioner's activities and associations "demonstrate[] that he remained

a member of [al-Qaida], thus having no need to renew his oath [of loyalty to the organization]

because he continued to abide by his original vow of allegiance"; whether the evidence supports

an inference that Petitioner "had a tacit understanding with al-Qaida operatives that he would

refer prospective jihadists to the organization"; and whether the Court can "infer from

[Petitioner's] numerous ties to known al-Qaida operatives that he remained a trusted member of

th[at] organization[.]"  Id. at 752-53.

 On October 17, 2011,[1] after Petitioner sought and received additional discovery, see, e.g.,

Minute Order (Feb. 11, 2011), Respondents added to the record several volumes of additional

---

 [1]  On remand, the Court initially reassigned this matter to the Honorable Emmet G.
Sullivan because of the retirement of the Honorable James Robertson.  See ECF No. 337.  On
October 11, 2011, the Court reassigned this matter to the Honorable Royce C. Lamberth.  See
ECF No. 380.

evidence addressing the questions the Court of Appeals posed regarding Petitioner's oath of loyalty to al-Qaida, his recruitment of jihadists, and his ongoing associations with al-Qaida members and others involved in terrorist activity.  See ECF No. 383.[2]  Pursuant to their obligations under section I.D.1 and I.E.1 of the CMO, Respondents produced additional documents to Petitioner's counsel regarding this additional evidence, and Respondents certified their compliance with these obligations on April 30, 2012.  See ECF No. 418.  On October 1, 2012, Petitioner moved for additional, wide-ranging discovery.  See ECF No. 427.

On October 31, 2012, Respondents opposed Petitioner's discovery motion, and—in an effort to reach the merits of Petitioner's case promptly and demonstrate that Petitioner is properly detained under the AUMF—Respondents simultaneously filed a motion for leave to file a motion for expedited judgment.  See ECF No. 430.  Respondents' motion for leave included, as an attachment, a 66-page motion for expedited judgment that set forth the factual basis for Petitioner's detention as part of al-Qaida based on a relatively small number of exhibits in the record.  Id.  This evidence did not include, among other things, any statements made by Petitioner while in detention except for those provided under the advice of his counsel (*e.g.*, his declarations and testimony).  Id.  In their opposition to Petitioner's motion for additional

---

[2]  After remand and before the production of this additional evidence, Respondents spent five months searching—at Petitioner's request—large volumes of information collected for the President's Guantanamo Task Force Review, and they produced to Petitioner's counsel classified and unclassified documents that were responsive to Petitioner's discovery requests.

discovery, Respondents requested that the Court resolve only those discovery requests that pertained to the evidence underlying the expedited judgment motion.  See id.

Petitioner opposed this effort to reach the merits of his habeas petition, see ECF No. 433, including by making an ex parte filing with the Court.  See ECF No. 438.  For nearly three years, Petitioner has made no further effort to prosecute his habeas case.

## ARGUMENT

Petitioner now moves the Court for an order to show cause in which he asks the Court to order Respondents (1) to "promptly provide" him with a "hearing before a Periodic Review Board," Pet. Mot. for Order to Show Cause, ECF No. 453, at 1, a review initially established by Executive Order 13567; (2) to "cease interfering with [his] access to this habeas Court," id., through purportedly "confiscating his legal papers," id. at 3; and (3) to "cease imposing arbitrary and severe restrictions on Petitioner's conditions of confinement," id. at 1, through purportedly confiscating and not returning to him certain "comfort" items such as a computer, photographs, books, and "personalized gifts … from prison guards," id. at 22.

Petitioner is not entitled to any of the relief that he seeks.[3]  First, with regard to a PRB hearing, the Court does not have jurisdiction to compel Respondents to provide Petitioner with a

_____

[3] Petitioner's motion also has two procedural defects.  First, he seeks relief entirely unrelated to his habeas petition, which challenges the lawfulness of the Executive's decision to detain him as part of or substantially supporting al-Qaida, Taliban, or associated forces, and seeks a remedy of release.  This motion advances a different claim and seeks a different remedy: injunctive relief regarding PRB sequencing procedures, and injunctive relief regarding the conditions of his confinement.  Yet Petitioner has never amended his habeas petition to set forth

PRB hearing ahead of the other Guantanamo detainees.  Even if the Court did have jurisdiction,

Petitioner has no legally cognizable right to such a hearing, and therefore, he has no right to

compel the order in which those discretionary hearings are provided to detainees.

Second, with regard to the purported seizure of his legal materials, Petitioner continues to

have access to all of his legal materials.  Like every other detainee confined in the same

detention camp as Petitioner, he is permitted to keep a certain amount of legal materials in his

place of confinement, but he may at any time request access—and will be given access—to any

of the additional materials held in storage.

Third, with regard to the seizure of so-called comfort items, authorities at Guantanamo

maintain significant discretion to administer the Guantanamo Bay detention facility to ensure

safety, discipline, and order, and Petitioner has identified no Constitutional right infringed with

respect to his comfort items, let alone one supporting a legitimate habeas corpus claim.

Regardless, Petitioner's assertions about the confiscation of certain comfort items are factually

inaccurate in part; and, to the extent that he is correct that certain items have been confiscated

---

the factual basis for these claims.  At minimum, as a matter of prudence, Petitioner's original
habeas petition should not be construed as a medium through which he can bring any legal claim,
no matter how distant from his original petition, to the attention of the Court.  Second, Petitioner
captions his motion as seeking an order to show cause, but rather than seek to compel an
explanation from Respondents, he instead seeks injunctive relief in the form of an order
compelling the sequencing of PRB hearings and regarding his purported conditions of
confinement.

from him and will not be returned, there are legitimate force protection, order, discipline, and safety reasons for the confiscation of those items.

**I.      Petitioner's Claim for an Immediate PRB Hearing Is Unfounded.**

Petitioner argues that Respondents are "legally obligated to provide him with a PRB hearing," Pet. Mot. at 9, and that this Court has the authority to order Respondents to "promptly provide" him with such a hearing, id. at 1.  Petitioner claims that he has an enforceable right to this hearing (and, thus, to its timing) based on (i) the Executive Order establishing the process, (ii) the Suspension and Due Process Clauses of the Constitution, and (iii) the AUMF and international law.  As an initial matter, this Court is without jurisdiction to hear such a claim because a motion to compel the sequencing of the PRB review process is not a proper habeas claim.  But, even if the Court does have jurisdiction, each of Petitioner's bases for claiming an enforceable right to such relief is without merit.

Before turning to the merits of these arguments, Respondents will provide the factual background for the PRB review process.

**A.      Background Regarding the Periodic Review Board**

Prior to the establishment of the PRB process, on January 22, 2009, the President issued Executive Order 13492 in which he ordered a comprehensive interagency review of the status of all detainees then held at the detention facility at Guantanamo Bay.  See Executive Order 13492, 74 Fed. Reg. 4897 (Jan. 22, 2009).  The interagency Task Force established by the Executive Order comprised representatives from the Departments of Justice, State, Defense, and Homeland

Security, as well as the Office of the Director of National Intelligence and the Joint Chiefs of

Staff.  Final Report, Guantanamo Review Task Force, at i (Jan. 22, 2010), available at

http://www.justice.gov/sites/default/files/ag/legacy/2010/06/02/guantanamo-review-final-

report.pdf.  The Task Force conducted a "[r]igorous [e]xamination" of "large volumes of

information" regarding "each detainee," id. at i, to "determine which detainees the United States

should transfer or release from custody, prosecute, or otherwise lawfully detain," id. at 1.  Task

Force members examined "information critically, giving careful consideration to the threat posed

by the detainee, the reliability of the underlying information, and the interests of national

security." Id. at i.[4]

One year later, that review was complete.  Id.  There was "unanimous agreement of

senior officials from each agency responsible for the review" as to the disposition of each

detainee.  Id. at 10.  Petitioner was one of 36 detainees referred for possible prosecution.  See

Guantanamo Review Disposition Chart at 4, ECF No. 445-1.

_____

[4] Previously, as a matter of policy, the Department of Defense had established
Administrative Review Boards (ARBs) to "assess whether each [Guantanamo detainee]
remain[ed] a threat to the United States and its allies in the ongoing armed conflict against al
Qaida and its affiliates and supporters," and to make a "determination to continue to detain,
release, or seek the transfer of the [detainee] to the control of another government."  Dep't of
Defense Order, Administrative Review Procedures for Enemy Combatants in the Control of the
Department of Defense at Guantanamo Bay Naval Base, Cuba (May 11, 2004), at ¶¶ 2(A) &
3(E)(v), available at http://www.defense.gov/news/May2004/d20040518gtmoreview.pdf; see
also id. ¶ 6 ("This Order is neither intended to nor does it create any right, benefit, or privilege,
substantive or procedural, enforceable by any party, against the United States[.]").  The
Department of Defense provided Petitioner with an ARB hearing in 2005, 2006, and 2007.  Each
of those ARBs determined that Petitioner should remain detained.

On March 7, 2011, the President issued Executive Order 13567, in which he established an administrative interagency process "to review on a periodic basis" whether continued detention of certain Guantanamo detainees is "necessary to protect against a significant threat to the security of the United States." Executive Order 13567, 76 Fed. Reg. 13277. The PRB process specifically "does not address the legality of any detainee's law of war detention." Id. at 13280. Petitioner—along with other detainees—will receive this PRB review.

Executive Order 13567 tasked the Secretary of Defense with "coordinat[ing the] process of periodic review of continued law of war detention"; with issuing (in "consultation with the Attorney General") the "implementing guidelines governing the process"; and with commencing the "initial review" for each detainee. Id. at 13277. Completing these tasks, however, required "working through numerous, complex issues associated with building a comprehensive process." U.S. Dep't of Defense News Release, No. 709-13 (Oct. 9, 2013), http://www.defense.gov/releases/release.aspx?releaseid=16302. As a result, the start of PRB reviews was delayed until October 9, 2013. See id.

The PRB's comprehensive review is outlined in a Department of Defense Memorandum setting forth the guidelines that implement the process established by the Executive Order. See Deputy Secretary of Defense, Directive-Type Memorandum (DTM) 12-005 (May 9, 2012) (attached Exh. A). Under the PRB process, an interagency review board composed of representatives from six U.S. Government Departments and offices conducts the review; each detainee is to receive a full PRB hearing every three years, and a review of his file for new

information every six months (a review that may result in a recommendation for a full PRB

hearing, even if prior to the three-year cycle).  See id. at 18-20, 22-23.  Most pertinent here, the

Periodic Review Board Secretariat (PRS), an entity established by the Secretary of Defense, see

Executive Order 13567, 76 Fed. Reg. 13278; DTM 12-005 at 12, recommends sequencing of

PRB hearings based on a "case management prioritization and assignment system."  DTM 12-

005 at 12.  The PRB makes the "final decision on case sequencing[] based on the PRS

recommendation and input from" the Deputy Assistant Secretary of Defense for Rule of Law and

Detainee Policy (now known as the Principal Director for Detainee Policy).  Id.

      The process for providing an individual Guantanamo detainee with a PRB hearing

includes a myriad of details.  Briefly, however, the process begins with the compilation of

information relevant to the PRB's decision on each detainee, which is then provided to the PRB;

the detainee's personal representative (a military officer) and cleared counsel generally may

receive classified information, whereas the detainee receives an unclassified summary of this

information.  See id. at 12-13.  "Process timelines have been developed to ensure that detainees

and their representatives receive ample time to prepare meaningful submissions."  U.S. Dep't of

Defense News Release, No. 709-13 (Oct. 9, 2013).  The detainee may submit information and

statements to the PRB, and the PRB will consider the detainee's request to present witnesses at

the hearing.  See DTM 12-005 at 15.  The detainee subsequently receives written notification of

the PRB's decision.  See id. at 18.[5]

On January 9, 2014, the Department of Defense announced the completion of the first

PRB hearing, which concluded that the continued law of war detention of Mahmud Abd Al Aziz

Al Mujahid (ISN 31) was no longer necessary.  See U.S. Dep't of Defense News Release, No.

NR-017-14 (Jan. 9, 2014), http://www.defense.gov/releases/release.aspx?releaseid=1647.[6]  Since

then, the PRB has conducted seventeen additional hearings and five file reviews.  See Periodic

Review Board Secretariat, U.S. Dep't of Defense,

http://www.prs.mil/reviewinformation/fullreviewpage.aspx.  There are three more full hearings

currently scheduled for the month of August.  Id.  Petitioner is among a number of other

detainees who, in due course, will receive a PRB hearing.

---

[5]  The Department of Defense's order implementing Executive Order 13567 sets forth the
following standard: "Continued law of war detention is warranted for a detainee subject to
periodic review if such detention is necessary to protect against a continuing significant threat to
the security of the United States."  DTM 12-005 at 6.  In making its determination, the PRB may
consider such factors as the "extent to which the detainee was involved in or facilitated terrorist
activities," his "ability to facilitate the movement or training of terrorists," the "nature and extent
of the detainee's ties with individual terrorists," and his "conduct in custody."  Id. at 7, 8.

[6]  On November 5, 2014, the first transfer of a detainee approved for transfer by the PRB
took place.  U.S. Dep't of Defense News Release No. NR-559-14 (Nov. 5, 2014),
http://www.defense.gov/Releases/Release.aspx?ReleaseID=17019

**B.      Petitioner's Claim for Injunctive Relief Related to a PRB Hearing Is Not Cognizable in Habeas, and Therefore Barred by 28 U.S.C. § 2241(e)(2), Because It Will Not Necessarily Alter the Fact, Duration, or Form of His Detention.**

Petitioner's motion to compel the United States to provide him with an immediate PRB hearing, ahead of other Guantanamo detainees, seeks relief beyond the scope of the habeas statute and, therefore, is jurisdictionally barred.  Through the Military Commissions Act of 2006, Congress withdrew the courts' jurisdiction over (1) habeas actions filed by or on behalf of Guantanamo detainees; and (2) any other action related to any aspect of the detainees' transfer, treatment, or trial, among other things.  See 28 U.S.C. § 2241(e)(1) (withdrawing habeas jurisdiction); id. § 2241(e)(2) (barring claims "relating to any aspect of the [detainees'] detention, transfer, treatment, trial, or conditions of confinement").  While the Supreme Court in Boumediene v. Bush, 553 U.S. 723 (2008), held Section 2241(e)(1) unconstitutional as applied to Guantanamo detainees like Petitioner, Section 2241(e)(2) still serves to divest courts of jurisdiction over any actions that are not "proper claim[s] for habeas relief."  Kiyemba v. Obama, 561 F.3d 509, 513 (D.C. Cir. 2009); see also Aamer v. Obama, 742 F.3d 1023, 1030 (D.C. Cir. 2014) ("[I]f petitioners' claims do not sound in habeas, their challenges constitute an action other than habeas corpus barred by section 2241(e)(2).") (citation and internal alterations omitted); Al-Zahrani v. Rodriguez, 669 F.3d 315, 319 (D.C. Cir. 2012) (lawsuit seeking damages is "an action other than habeas corpus").

13

Petitioner's claim regarding a PRB hearing does not sound in habeas, and, therefore, is barred, because rather than seek an order of release or challenge to his conditions of confinement, Petitioner instead seeks an order compelling the United States to alter the procedures in a review process that may only *possibly* result in his release: specifically, Petitioner seeks an order requiring the PRS to change its sequencing procedures so that he may receive an immediate PRB hearing to determine whether continued detention of Petitioner is "necessary to protect against a significant threat to the security of the United States," which may result in a determination that he is eligible for transfer.[7]

Although the Supreme Court has not directly addressed whether a claim that *may* result in release sounds in habeas, its recent decisions strongly suggest that it would not.  In <u>Skinner v. Switzer</u>, 562 U.S. 521 (2011), a case in which a prisoner filed a non-habeas claim seeking to compel access to certain evidence for DNA testing, the Supreme Court rejected the argument that the claim should have been filed as a habeas petition and explained that "when a prisoner's claim would not 'necessarily spell speedier release,' that claim does not lie at 'the core of habeas corpus,' and may be brought, *if at all*, under [42 U.S.C.] § 1983."[8]  <u>Id.</u> at 535 n.13 (quoting

---

[7] To date, Petitioner has received four hearings assessing the threat he may pose to U.S. interests: the three ARB hearings designated him for continued detention, and the President's Executive Task Force referred him for possible prosecution.

[8] This series of Supreme Court cases addressed the relationship between claims brought under 42 U.S.C. § 1983 and claims brought as habeas petitions.  As the Supreme Court explained in one of its later decisions on the issue, "considerations of linguistic specificity, history, and comity led the Court to find an implicit exception from § 1983's otherwise broad scope for

Wilkinson v. Dotson, 544 U.S. 74, 82 (2005)) (emphasis added).  The Court further explained that it was not aware of any case "in which the Court has recognized habeas as the sole remedy, *or even an available one*, where the relief would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody.'"  Id. at 534 (quoting Dotson, 544 U.S. at 86 (Scalia, J., concurring)) (emphasis added);[9] see also Muhammad v. Close, 540 U.S. 749, 754-55 (2004) (per curiam) (holding that a petitioner "raise[s] no claim on which habeas relief could have been granted on any recognized theory" where the administrative determinations he challenged did not "raise any implication about the validity of the underlying conviction" nor "necessarily" "affect[ed] the duration of time to be served").

Guided by these recent Supreme Court decisions, the D.C. Circuit recently reassessed its related habeas jurisprudence and strongly suggested that claims like Petitioner's do not sound in habeas.  In Davis v. U.S. Sentencing Commission, 716 F.3d 660 (D.C. Cir. 2013), the Court of Appeals analyzed Skinner and explained that "habeas might not even be *available* for

---

actions that lie 'within the core of habeas corpus.'"  Wilkinson v. Dotson, 544 U.S. 74, 79 (2005) (quoting Preiser v. Rodriguez, 411 U.S. 475, 487 (1973)).

[9] "It is one thing to say that permissible habeas relief … includes ordering a quantum of change in the level of custody … It is quite another to say that the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody.  That is what is sought here: the mandating of a new parole hearing that may or may not result in release, prescription of the composition of the hearing panel, and specification of the procedures to be followed.  A holding that this sort of judicial immersion in the administration of discretionary parole lies at the 'core of habeas' would utterly sever the writ from its common-law roots."  Dotson, 544 U.S. at 86 (Scalia, J., concurring) (citations omitted).

'probabilistic' claims." Id. at 665 (citing Skinner, 562 U.S. at 534).  Based in significant part on

that reasoning, the Court of Appeals overturned Razzoli v. Federal Bureau of Prisons, 230 F.3d

371 (D.C. Cir. 2000), a decision holding that a claim must be brought in habeas even when it

would have merely a probabilistic impact on the duration of custody.[10]  Davis, 716 F.3d at 666.

Although the Court of Appeals has not yet taken the next step and squarely held that such claims

do not sound in habeas, the Court of Appeals for the Ninth Circuit recently did when it held that

"a claim challenging prison disciplinary proceedings is cognizable in habeas only if it will

'necessarily spell speedier release' from custody, meaning that the relief sought will either

terminate custody, accelerate the future date of release from custody, or reduce the level of

custody."  Nettles v. Grounds, 788 F.3d 992, 995 (9th Cir. 2015) (quoting Skinner, 562 U.S. at

535 n.13); cf. Hernandez v. Stephens, No. 3:13-1391, 2014 WL 667373, at *2 (N.D. Tex. Feb.

20, 2014) ("Petitioner's constitutional challenge to Texas' good-time parole eligibility statute

---

[10] Prior to Skinner, in a lawsuit seeking to compel access to a parole eligibility hearing, the Court of Appeals held that such a lawsuit could not be brought under Section 1983 because "a prisoner's challenge to the determination of his eligibility for parole does indeed attack the 'fact or duration' of confinement … [and] therefore, habeas is the sole remedy available to such a prisoner."  Chatman-Bey v. Thornburgh, 864 F.2d 804, 810 n.5 (D.C. Cir. 1988).  After two subsequent Supreme Court decisions "cast doubt on [the D.C. Circuit's] view, expressed in Chatman-Bey, that its scope extended beyond claims for immediate release or a definite reduction in the length of imprisonment," Davis, 716 F.3d at 663, a federal prisoner challenging a decision to delay his eligibility for parole contested the validity of the Chatman-Bey decision in Razzoli v. Fed. Bureau of Prisons, 230 F.3d 371 (D.C. Cir. 2000).  In Razzoli, the Court of Appeals found "Chatman-Bey alive and at worst only modestly ailing," 230 F.3d at 376, and held that "habeas is indeed exclusive even when a non-habeas claim would have a merely probabilistic impact on the duration of custody," id. at 373.  In Davis, however, the Court of Appeals overturned Razzoli.

and the denial of a presumptive parole date are not cognizable on habeas review" because it "d[id] not allege that Petitioner would be automatically entitled to accelerated release if [relief were granted][.]").

Petitioner's claim for relief is even further afield from the types of claims that the Supreme Court and Court of Appeals suggested should not be brought in habeas.  See Dotson, 544 U.S. at 82 ("[T]he prisoners' claims for *future* relief (which, if successful, will not necessarily imply the invalidity of confinement or shorten its duration) are yet more distant from th[e] core [of habeas corpus].") (citation omitted).  In Dotson, state prisoners challenged certain aspects of Ohio's parole procedures, including a determination about one petitioner's eligibility for a parole hearing, 544 U.S. at 76-77, and the Supreme Court later explained in Skinner that such a "claim does not lie at the core of habeas corpus, and may be brought, *if at all*, under [42 U.S.C.]§ 1983."  Id. at 535 n.13 (quoting Dotson, 544 U.S. at 82 (Scalia, J., concurring)) (emphasis added).  Here, unlike the petitioner in Dotson who challenged his *eligibility* for a parole hearing, there is no dispute that Petitioner will receive a PRB hearing.  Rather, at bottom, Petitioner challenges the discretionary procedures by which the Executive is providing PRB hearings, namely, the PRS's sequencing procedures and determinations, and he wants to jump the line by having the Court order Respondents to provide him with a PRB hearing before every other Guantanamo detainee awaiting one.  Such a procedural challenge is even more distant from the core remedy of release than a challenge to parole eligibility.  Instead of a habeas claim, Petitioner's claim is much closer to a lawsuit brought under the Administrative Procedure Act to

compel agency action alleged to have been unlawfully withheld or unreasonably delayed.  See 5 U.S.C. § 706(1); see also, e.g., In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig., 751 F.3d 629, 634 (D.C. Cir. 2014) (APA Section 706(1) "applies only to '*discrete* action' that is 'legally *required* … about which an official had no discretion whatever'") (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 63-64 (2004)).  Such a claim, however, is precisely the type foreclosed by 28 U.S.C. § 2241(e)(2), and a holding that such claims can be brought in habeas risks inviting any number of claims that might only possibly relate or lead to release.

Accordingly, the Court should adhere to the relevant guidance of the Supreme Court and Court of Appeals and determine that Petitioner's claim does not sound in habeas, and, therefore, is barred by § 2241(e)(2),[11] because it seeks injunctive relief too far removed from habeas' traditional remedy of release or a reduction in the level of custody.

---

[11] The appropriate consideration is whether a claim properly sounds in habeas, not the likelihood of success or actual success of a petitioner in obtaining the relief sought.  Cf. Dotson, 544 U.S. at 87 (Scalia, J., concurring) (explaining that the correct focus is "whether the claims [petitioners] pleaded were claims that may be pursued in habeas—not [] whether [petitioners] can be successful in obtaining habeas relief on those claims"); cf. also Mitchell v. United States, 930 F.2d 893, 897 (Fed. Cir. 1991) (appropriate question is whether claim may be brought under Administrative Procedure Act or whether other avenues offer adequate remedies, not whether petitioner is entitled to receive those other remedies); McGregor v. Greer, 748 F. Supp. 881, 884 (D.D.C. 1990) (same).

**C.      Petitioner Has No Legally Cognizable Right to an Immediate PRB Hearing.**

**1.      The Executive Order Does Not Create a Private Cause of Action.**

As explained above, Petitioner will receive a PRB hearing.  To the extent Petitioner argues that the Executive Order entitles him to an immediate PRB hearing, Petitioner has no claim; the Executive Order does not create a private cause of action in favor of Petitioner.

Petitioner argues that the Executive Order establishing the PRB process has "the force and effect of binding law" because "it was issued pursuant to the President's powers and in accordance with a statutory mandate," and so the "Department of Defense is not free to disregard it."  Pet. Mot. at 9.  To be sure, the Executive Order was issued pursuant to the President's powers under the Constitution as well as "the laws of the United States," including the AUMF. See Executive Order 13567, 76 Fed. Reg. 13277.  The Court need not, however, determine whether the AUMF was a "statutory mandate or a delegation from Congress of lawmaking authority," which would give the Executive Order the "force and effect of law," U.S. Dep't of Health & Human Servs. v. Federal Labor Rel. Auth., 844 F.2d 1087, 1096 (4th Cir. 1988); see In re Surface Mining Regulation Litig., 627 F.2d 1346, 1357 (D.C. Cir. 1980), because such a determination is necessary but is not sufficient for Petitioner to prevail on this claim.

Regardless of whether "the [Executive] Order has the force and effect of law," Petitioner "would still have to demonstrate that it was intended to create a private right of action."  Indep. Meat Packers Ass'n v. Butz, 526 F.2d 228, 236 (8th Cir. 1975); see also Women's Equity Action League v. Cavazos, 906 F.2d 742, 750 (D.C. Cir. 1990) (finding that the plaintiffs had no "tenable claim to an implied right of action under [an] Executive Order" when there was "no

19

evidence of an intent to create" such a right).[12]  This Petitioner cannot, and has not attempted to, do.  See Pet. Mot. at 9-11.[13]

As a general matter, executive orders are viewed as management tools for implementing the President's policies, and not as legally binding documents that may be enforced against the Executive Branch.  See In re Surface Mining Regulation Litig., 627 F.2d at 1357; see also, e.g., Chai, 48 F.3d at 1338-39; Facchiano Constr. Co. v. U.S. Dep't of Labor, 987 F.2d 206, 210 (3d Cir. 1993); Indep. Meat Packers Ass'n, 526 F.2d at 236.  Here, the plain language of Executive Order 13567 (not referenced in Petitioner's motion) shows an intent not to create such a private right:  "This order is not intended to, and does not, create any right or benefit, substantive or

---

[12]  See also, e.g., Chai v. Carroll, 48 F.3d 1331, 1338-39 (4th Cir. 1995) ("Furthermore, an executive order is privately enforceable only if it was intended to create a private cause of action."); Utah Ass'n of Counties v. Bush, 316 F. Supp. 2d 1172, 1200 (D. Utah 2004) (making clear that an executive order must be intended to create a private right of action and have the force and effect of law before a litigant can enforce the order against the Executive); Daniel L. Pines, The Central Intelligence Agency's "Family Jewels":  Legal Then?  Legal Now?, 84 Ind. L.J. 637, 654 (2009) ("Courts will enforce executive orders only if two criteria are met.  First, the executive order must have been issued 'pursuant to a statutory mandate or delegation of authority from Congress.'  Second, the order must indicate a clear intention by the President to create a private right of action.").

[13]  Indeed, the author of the law review article upon which Petitioner relies, see Pet. Mot. at 10, recognizes that "[w]hen a particular executive order derives its authority from both the President's powers under the Constitution and from Congress"—as Executive Order 13567 does—"it most likely will be true that neither Congress nor the President intended to create a private right of action."  John E. Noyes, Executive Orders, Presidential Intent, and Private Rights of Action, 59 Tex. L. Rev. 837, 876 n.154 (1981).  Petitioner has not shown otherwise.

procedural, enforceable at law or in equity by any party against the United States, its

departments, agencies, or entities, its officers, employees, or agents, or any other person."

Executive Order 13567, 76 Fed. Reg. at 13280.

The Court of Appeals has regularly found that such language is dispositive and precludes

judicial review.  See Helicopter Ass'n Int'l, Inc. v. FAA, 722 F.3d 430, 439 (D.C. Cir. 2013)

(executive order at issue contained similar language disclaiming a private right of action);

Communities Against Runway Expansion, Inc. v. FAA, 355 F.3d 678, 688-89 (D.C. Cir. 2004)

(executive order "expressly stat[ing] that [it did] not create a private right to judicial review"

could not form the basis for the suit); Air Transp. Ass'n of Am. v. FAA, 169 F.3d 1, 8-9 (D.C.

Cir. 1999) (finding that this language means an executive order "is not subject to judicial

review"); Meyer v. Bush, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order

devoted solely to the internal management of the executive branch—and one which does not

create any private rights—is not, for instance, subject to judicial review.").[14]

Applying such circuit precedent, this Court previously found that a detainee's asserted

"right to be free" could not "be grounded in" Executive Order 13492, which established the 2009

Guantanamo Review Task Force, because "its terms" expressly stated that it did not "create any

right or benefit."  Ahjam v. Obama, 37 F. Supp. 3d 273, 280 (D.D.C. 2014) (Lamberth, J.) (citing

Meyer).  And other judges on this Court have made similar findings in other contexts based on

---

[14]  See also Kevin M. Stack, The Statutory President, 90 Iowa L. Rev. 539, 552 (2005)
("Courts generally treat [an] . . . express" "disclaim[er]" of "any intention to create any right of
enforcement" in an executive order "as a bar to judicial enforcement . . . .  Indeed, the inquiry
into the judicial enforceability of executive orders has largely focused on the intention, in the
order itself, to create a private right of action.").

express language disclaiming any private right of action.  See, e.g., Fla. Bankers Ass'n v. U.S. Dep't of Treasury, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014); Defenders of Wildlife v. Jackson, 791 F. Supp. 2d 96, 120-21 (D.D.C. 2011); Alliance for Natural Health v. Sebelius, 775 F. Supp. 2d 114, 135 n.10 (D.D.C. 2011); Natural Res. Def. Council v. U.S. Dep't of State, 658 F. Supp. 2d 105, 108 (D.D.C. 2009).[15]

Accordingly, Petitioner cannot claim a right to an expedited PRB hearing based on the terms of the Executive Order.

### 2.    Petitioner Does Not Have a Right to a PRB Hearing under Either the Suspension Clause or the Due Process Clause.

Petitioner argues that failure, to date, to provide him with a PRB hearing "violates the Suspension and Due Process Clauses because it bars [him] from receiving meaningful review of his continued detention."  Pet. Mot. at 11.  Neither claim is correct.

Petitioner argues that Executive Order 13567, which first established the PRB process, "implemented" the Suspension Clause's "constitutional requirement" that Petitioner be given a "meaningful opportunity to demonstrate" that "his *continued* detention is unlawful because he does not pose a threat to the United States."  Pet. Mot. 11- 12 (citing Boumediene).  "Depriving"

---

[15]   Petitioner relies upon Old Dominion Branch No. 496 v. Austin, 418 U.S. 264 (1974), for the proposition that an executive order "*may* create rights protected against inconsistent state laws through the Supremacy Clause," Pet. Mot. at 9 (emphasis added), but that decision does not undermine, and is not inconsistent with, Respondents' argument.  The executive order at issue in that case specifically created certain labor rights for federal employees, and (as federal law) preempted state libel laws.  See Old Dominion Branch No. 496, 418 U.S. at 273 n.5, 278, 282-84.  Similar facts are not presented here.

him of "access to [that] proceeding," he maintains, "violates his right to the meaningful review guaranteed by the Suspension Clause." Id. at 12.

But the fact that Petitioner has not yet received a PRB hearing is not a suspension of anything, let alone of the right to habeas corpus protected by the Suspension Clause of the Constitution. Cf. Kiyemba v. Obama, 605 F.3d 1046, 1048 (D.C. Cir. 2010) (rejecting Suspension Clause challenge to statutes restricting transfer of Guantanamo detainees to U.S. because they "suspend nothing"). The Suspension Clause states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., Art. I, § 9, cl. 2. Petitioner never provides a clear explanation of how his purported right to a more prompt PRB hearing amounts to a violation of the Suspension Clause, especially given that he retains the right to challenge the lawfulness of his detention through this habeas petition even though he has not pursued his case for the past three years. See Pet. Mot. at 11-12.[16] Thus, the Court can simply reject Petitioner's argument on its face.

Petitioner's argument also fails because it conflates the "meaningful review" available through a habeas petition that the Supreme Court addressed in Boumediene with the review

---

[16] Petitioner contends that, at a PRB hearing, he would show that "(1) he was never detained on 'the field of battle'; (2) there is not now and never has been any basis to detain him under the AUMF"; and (3) "his *continued* detention is unlawful because he does not pose a threat to the United States." Id. at 12. Petitioner could try to make the first two of these three showings in his still-pending habeas case.

provided by the Executive through the PRB process, which is unrelated to, and certainly does not

"implement[]," Boumediene's holding.  In Boumediene the Supreme Court found that the

Suspension Clause had "full effect at Guantanamo Bay," 553 U.S. at 771, that "the [then-

available] review procedures [we]re an inadequate substitute for habeas corpus," id. at 795, and

that 28 U.S.C. § 2241(e)(1) thus constituted an unconstitutional suspension of the writ, id. at 792.

The Court held "*only* that petitioners [] are entitled to seek the writ [of habeas corpus]," id. at

795 (emphasis added), and that "the privilege of habeas corpus entitled [a detainee] to a

meaningful opportunity to demonstrate that he is being held pursuant to the erroneous

application or interpretation of relevant law," id. at 779 (citation and internal quotation marks

omitted).  The Court did not require, or even suggest, that the Suspension Clause requires the

Executive to provide access to a periodic review hearing to evaluate the threat posed by a

detainee, as Petitioner now claims.  See Ahjam, 37 F. Supp. 3d at 278 (Lamberth, J.) ("The writ

of habeas corpus remains the *sole* means [under Boumediene] by which Guantanamo detainees

may challenge the legality of their detention.") (emphasis added).  Thus, habeas review by this

Court, and not an administrative review process established by Executive Order, "implement[s]"

the constitutional requirements set forth in Boumediene.

Moreover, that right to habeas review does not require a periodic review of threat.

Supreme Court and Circuit precedent set forth the proper scope of a Guantanamo detainee's

habeas petition.  In Hamdi v. Rumsfeld, 542 U.S. 507 (2004), a plurality of the Court held that

the AUMF authorizes the detention of enemy forces for the duration of active hostilities, id. at

24

521, and subsequently the Court of Appeals held that, pursuant to the AUMF, the Executive may

lawfully detain, for the duration of hostilities, individuals who, at the time of capture, were part

of or substantially supporting al-Qaida, Taliban, or associated forces.  See, e.g., Ali v. Obama,

736 F.3d 542, 544 (D.C. Cir. 2013); Salahi, 625 F.3d at 751; Al-Bihani v. Obama, 590 F.3d 866,

872 (D.C. Cir. 2010).  Thus, neither the Supreme Court nor the Court of Appeals has held that

the Executive's authority to detain certain individuals for the duration of active hostilities is

contingent upon the Executive providing a periodic administrative review.

Further, the habeas petition's "meaningful review" allows a detainee to challenge

whether he was (for example) part of al-Qaida at the time of his capture, but "[w]hether a

detainee would pose a threat to U.S. interests if released is not at issue in habeas corpus

proceedings in federal courts concerning aliens detained under the authority conferred by the

AUMF."[17]  Awad v. Obama, 608 F.3d 1, 11 (D.C. Cir. 2010); id. ("[T]he United States's

authority to detain [enemy forces] is not dependent on whether an individual would pose a threat

---

[17]  Petitioner contends, without citation to any authority, that "if Executive Order 13567 had not established the PRB process and review, this Court would be required under the Suspension Clause to conduct an equivalent review."  Pet. Mot. at 12 n.5.  This contention fails for the same reasons as set forth in the text.  Additionally, the Supreme Court has recognized that analyzing a detainee's "potency for mischief"—as Petitioner suggests the Court may do in a PRB-like review of his current threat to U.S. interests—is a matter "of political judgment for which judges have neither technical competence nor official responsibility."  Ludecke v. Watkins, 335 U.S. 160, 170 (1948).  Cf. Dep't of Navy v. Egan, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (determination by Secretary of State that "the terrorist activity of the organization threatens the . . . national security" was "nonjusticiable").

to the United States or its allies if released but rather upon the continuation of hostilities.").[18]

Thus, because the Court of Appeals has held that properly detained detainees may be held until the end of hostilities and that the threat a detainee poses to U.S. interests is not an appropriate consideration in habeas, the Executive's alleged failure to provide Petitioner with a more prompt PRB hearing to review his threat level works no harm to Petitioner's right to petition for habeas review, and therefore, cannot constitute a violation of the Suspension Clause. For these reasons, the Suspension Clause simply does not provide Petitioner with any legal entitlement to a PRB hearing, let alone entitlement to have one ahead of other detainees.

Petitioner's second assertion, that he has a due process right to a PRB hearing, is equally unavailing. Petitioner argues that the Due Process Clause "protects [his] right to be free from arbitrary detention and his liberty interest in a PRB." Pet. Mot. at 12. He claims to have such a right because the Supreme Court's "rejection of an exclusive focus on territoriality" to determine whether the Constitution applies "was in no way limited to considerations specific to the Suspension Clause" so that the same "functional" test should apply here to extend the Due Process Clause to the detention facility at Guantanamo Bay, id. at 12. In a footnote, he describes a Court of Appeals decision to the contrary as based on "[u]nnecessarily broad language" and asserts, without citation, that "subsequent decisions have not relied on that overly broad

---

[18] See also al Odah v. United States, 62 F. Supp. 3d 101, 112 (D.D.C. 2014); Al Warafi v. Obama, 704 F. Supp. 2d 32, 38 (D.D.C. 2010) (Lamberth, J.), aff'd in part and remanded on other grounds by 409 F. App'x 360 (D.C. Cir. 2011); Anam v. Obama, 696 F. Supp. 2d 1, 4 (D.D.C. 2010).

language, and have correctly assumed that multiple constitutional protections, including the Due

Process Clause, do apply." Id. at 13-14 n.6.

Petitioner's argument is not sufficient to surmount binding Circuit precedent and prior

decisions of this Court to the contrary.  The Court of Appeals has held that "the due process

clause does not apply to aliens" detained at Guantanamo Bay who have no "property or presence

in the sovereign territory of the United States."  Kiyemba v. Obama, 555 F.3d 1022, 1026 (D.C.

Cir. 2009) (Kiyemba I), vacated and remanded, 559 U.S. 131 (2010) (per curiam), reinstated,

605 F.3d 1046 (D.C. Cir. 2010).  This holding is narrow and specific, and Petitioner's glib

dismissal of this holding as "[u]necessarily broad" and "overly broad" is simply unfounded.

Additionally, his suggestion that subsequent decisions have not relied upon this holding in

Kiyemba is not correct.  See Al-Madhwani v. Obama, 642 F.3d 1071, 1077 (D.C. Cir. 2011)

(citing Kiyemba I's due process holding and stating that it did "not accept" the "premise[]" that

the petitioner "had a constitutional right to due process"); see also Al Bahlul v. United States,

767 F.3d 1, 33 (D.C. Cir. 2014) (Henderson, J, concurring) (noting that "it remains the law of

this circuit that, after Boumediene, aliens detained at Guantanamo may not invoke the

protections of the Due Process Clause of the Fifth Amendment").

Moreover, judges on this Court have continued to follow this holding as binding Circuit precedent.[19] See, e.g., Rabbani v. Obama, -- F. Supp. 3d --, 2014 WL 7334117, at *3 (D.D.C. Dec. 19, 2014) (Lamberth, J.) ("[E]xisting Circuit precedent forecloses any remedy for an alleged Fifth Amendment due process violation."); Ameziane v. Obama, 58 F. Supp. 3d 99, 103 n.2 (D.D.C. 2014) (noting that petitioner's Due Process Clause arguments "fail" "[u]nder Circuit precedent"); Al Wirghi v. Obama, 54 F. Supp. 3d 44, 47 (D.D.C. 2014) (Lamberth, J.) (finding that the petitioner had no "judicially cognizable [liberty] interest" to support standing to assert a Due Process Clause claim); Bostan v. Obama, 674 F. Supp. 2d 9, 29 (D.D.C. 2009) ("The detainees at Guantanamo Bay . . . have no due process rights.").

Petitioner's attempt to circumvent binding precedent by relying on Boumediene is also unavailing.  He claims that the conclusion that "the Due Process Clause applies to [his] detention follows from the Supreme Court's guidance in Boumediene" because "its rejection of an exclusive focus on territoriality was based on precedents concerning the extraterritorial scope of several constitutional provisions, and was in no way limited to considerations specific to the Suspension Clause."  Pet. Mot. at 12.  But Petitioner's if-one-then-all reasoning is not supported. Indeed, the Court of Appeals has rejected attempts to read Boumediene's narrow holding about the application of the Suspension Clause to Guantanamo detainees more broadly.  In Rasul v.

---

[19]  "[D]istrict judges . . . are obligated to follow controlling circuit precedent until either . . . [the Court of Appeals], sitting en banc, or the Supreme Court, overrule it."  United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997).

Myers, 563 F.3d 527 (D.C. Cir. 2009), the Court of Appeals determined that "the Court in

Boumediene disclaimed any intention to disturb existing law governing the extraterritorial reach

of any constitutional provisions, other than the Suspension Clause." Id. at 529.  Relying on

Rasul, other judges on this Court have thus rejected the same argument Petitioner makes here.

See, e.g., Rabbani, 2014 WL 7334117, at *3 n.5; Bostan, 674 F. Supp. 2d at 29 n.10.

Accordingly, Petitioner has no right to an accelerated PRB hearing grounded in either the

Suspension Clause or the Due Process Clause.

### 3. The Fact that Petitioner Has Not Yet Received a PRB Hearing Is Not a Violation of the AUMF or International Law.

Petitioner claims that "the AUMF *itself requires* that detention be subject to periodic

review in accordance with the laws of war," Pet. Mot. at 16, because the Government's detention

authority is informed by principles derived from the laws of war, id., and provisions of the

Fourth Geneva Convention call for the biannual review of certain interned civilians to determine

if the reasons for internment continue to exist, id. at 17-18 (citing GC IV Art. 43 & 132).  See

also id. at 16 & n.8 ("[T]he AUMF cannot authorize the continued detention of individuals like

[himself] without periodic review to determine whether that detention is necessary [to prevent a

continued security threat].").  Petitioner's claim is incorrect as a matter of law and logic.

As explained below, the Executive has detained Petitioner as a part of enemy forces (al-

Qaida), and given the nature of the armed conflict in which he has been detained, and as a matter

of international law, neither the Third nor the Fourth Geneva Convention of 1949 applies directly

to this conflict, with the notable exception of Common Article 3.  The Geneva Conventions

distinguish between two types of armed conflict: international armed conflict and non-

international armed conflict.  Common Article 2 (so-called because it appears in each of the four

1949 Geneva Conventions) states that "the present Convention[s] shall apply to all cases of

declared war or of any other armed conflict which may arise between two or more of the High

Contracting Parties, even if the state of war is not recognized by one of them."  See, e.g., GC III,

Art. 2.[20]  In contrast, Common Article 3 states that, "[i]n the case of armed conflict not of an

international character occurring in the territory of one of the High Contracting Parties, each

Party to the conflict shall be bound to apply, as a minimum, the following … [detained persons]

---

[20] Petitioner's suggestion that the Third Geneva Convention applies to only "a uniformed
member of a regular armed force of a nation state," Pet. Mot. at 17, is inaccurate.  In an
international armed conflict, prisoner of war status is afforded principally to (1) members of the
armed forces of a State that is a Party to the conflict, and to (2) members of other militias or
volunteer corps that are commanded by a responsible superior officer, have fixed distinctive
insignia, carry arms openly, and conduct their operations in accordance with the laws of war,
including by refraining from conducting attacks against civilians.  GC III Art. 4(A)(1) & (2).
But, even in the context of an international armed conflict, Article 4 does not purport to define
all categories of enemy armed groups that may be detained, but rather only categories of enemy
forces that may be entitled to prisoner-of-war status.  Id.  "Otherwise, the United States could not
militarily detain enemy forces who are not entitled to prisoner-of-war status except in limited
circumstances, and this would be contrary to the terms of the AUMF and the law-of-war
principle of necessity.  See ECF 189 (Mar. 13, 2009), Resp't Mem. Regarding the Gov't's
Detention Authority, at 8-9; see also U.S. Dep't of Defense Law of War Manual (June 2015)
§ 2.2 ("Military necessity may be defined as the principle that justifies the use of all measures
needed to defeat the enemy as quickly and efficiently as possible that are not prohibited by the
law of war."), available at http://www.defense.gov/pubs/Law-of-War-Manual-June-2015.pdf
("DoD Law of War Manual"); id. § 2.2.1 ("[M]ilitary necessity underlies law of war concepts
that explain when persons and property may be the object of attack[.]").

shall in all circumstances be treated humanely."  Id. Art. 3.  Thus, the nature of the conflict

determines application of many of the provisions of the Conventions.

In February 2002, the Executive determined that al-Qaida forces did not merit prisoner-

of-war status under the Third Geneva Convention because al-Qaida is a terrorist organization and

not a State that is a High Contracting Party to the Third Geneva Convention.  See White House

Press Secretary Announcement of President Bush's Determination Re Legal Status of Taliban

and Al Qaeda Detainees (Feb. 7, 2002), http://www.state.gov/s/l/38727.htm; see also Abbott v.

Abbott, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a

treaty is entitled to great weight.") (citation and internal quotation marks omitted).  Thus, with

respect to both the Third and the Fourth Geneva Conventions, the only protections to which

Petitioner is entitled are those provided by Common Article 3.  See also Hamdan v. Rumsfeld,

548 U.S. 557, 630-31 (2006) (conflict against al-Qaida is non-international and governed by

Common Article 3).[21]

Arguing to the contrary and insisting that certain provisions of the Fourth Geneva

Convention should be read to limit the Executive's detention authority over him, Petitioner

constructs a false dichotomy.  He begins by asserting that "[t]here are two principal sources of

law-of-war authority for the detention—and review of detention—of individuals in an armed

conflict:  the [Third Geneva Convention] and the [Fourth Geneva Convention]."  Pet. Mot. at 17.

---

[21] Thus, Petitioner correctly states that Respondents "ha[ve] never accorded him prisoner-of-war status," Pet. Mot. at 17; this is because the Executive determined that al-Qaida forces—which include Petitioner—are not entitled to such status.

He then reasons that "[t]he Defense Department has never claimed that the Third Geneva Convention applies to [him], nor could it, because [he] is not alleged to be a uniformed member of a regular armed force of a nation state (as would be required for the Third Geneva Convention to apply) and the Pentagon has never accorded him prisoner-of-war status," id.; so, Petitioner concludes, "to the extent that the AUMF authorizes [his] detention *at all*, that detention *must* be informed by the requirements of the Fourth Geneva Convention, which covers individuals who are not combatants, including unprivileged belligerents," id. (emphasis added).

But Petitioner's reasoning is fallacious because neither the laws of war nor the 1949 Geneva Conventions bisect humanity in an armed conflict into civilians and "uniformed members of a regular armed force of a national state"; rather, the laws of war recognize a distinction between (and among) civilians and combatants.  See, e.g., DoD Law of War Manual §§ 4.2, 4.3 & 4.8; see also supra at 30 n.21.  Thus, Petitioner's argument that principles from the Third and Fourth Geneva Conventions essentially amounts to a claim that the Court should consider him (and every other Guantanamo detainee) to be a "civilian" by default.  Such a claim, however, is inconsistent with the AUMF, the laws of war, the Executive's determination of Al-Qaida's status under the Geneva Conventions, the Executive's determination that Petitioner was part of enemy forces,[22] and prior decisions of this Court.[23]

---

[22]  In 2004, a Combatant Status Review Tribunal determined that Petitioner was, in fact, part of or supporting al-Qaida forces.  See DoD FOIA CSRT Records at 3785-3811, available at http://www.dod.mil/pubs/foi/Reading_Room/Detainee_Related/publicly_filed_CSRT_records_3785-3874.pdf.  Pursuant to the Supreme Court's decision in Boumediene v. Bush, 553 U.S. 723

Any delay in Petitioner's PRB hearing is not a violation of the AUMF.  The AUMF authorizes the use of force, including detention, against enemy groups like al-Qaida and individuals who are part of or substantially supporting such groups or their associated forces.  In its March 2009 brief concerning the Executive's detention authority, the Government explained that "[t]he President [] has the authority under the AUMF to detain in this armed conflict those persons whose relationship to al-Qaida or the Taliban would, in appropriately analogous circumstances in a traditional international armed conflict, render them detainable."  ECF 189 (Mar. 13, 2009), Resp't Mem. Regarding the Gov't's Detention Authority, at 1 ("Resp't March 13 Mem.").  Analogizing to the appropriate circumstances, the Government further explained that "[i]t is well settled that individuals who are part of private armed groups are not immune from military detention simply because they fall outside the scope of Article 4 of the Third Geneva Convention."  Id. at 8.  Accordingly, the Government claimed the authority under the AUMF as informed by the laws of war to use "necessary and appropriate military force

_____

(2008), of course, Petitioner may challenge the lawfulness of his detention by filing a petition for a writ of habeas corpus, which requires the Government to demonstrate that he was lawfully detained as part of, or having substantially supported, al-Qaida, Taliban, or associated forces. See, e.g., Ali v. Obama, 736 F.3d 542, 544 (D.C. Cir. 2013).  Although this habeas action purports to challenge the lawfulness of his detention as part of enemy forces, Respondents sought an expedited hearing in 2012 but Petitioner resisted that effort, and his case has been dormant since that time.

[23] As discussed above, except for Common Article 3, the Fourth Convention by its terms does not apply to the armed conflict in which Petitioner has been detained.  Moreover, even assuming that Common Article 3 requires such periodic reviews like those provided by the PRB, it certainly does not mandate when or how often those reviews should occur.  See CG III Art. 3; see also DoD Law of War Manual § 8.14.2.

[including the power to detain] against members … of an armed group like al-Qaida." Id. at 5. Moreover, the Government also reasoned that "individuals who provide substantial support to al-Qaida forces … may properly be deemed part of al-Qaida itself," and therefore detainable, consistent with law of war principles.  Id. at 7.  For these reasons, when considering the scope of the Executive's detention authority in March 2009, one member of this Court rejected arguments nearly identical to Petitioner's as "flawed" because "the lack of combatant status in non-international armed conflicts does not, by default, result in civilian status for all, even those who are members of enemy 'organizations' like al Qaeda."  Hamlily v. Obama, 616 F. Supp. 2d 63, 73 (D.D.C. 2009) (citing Gherebi v. Obama, 609 F. Supp. 2d 43, 65 (D.D.C. 2009)); see also Gherebi, 609 F. Supp. 2d at 66 ("It would [] cripple a state's capability to effectively combat the enemy force in a non-international armed conflict if the members of that enemy force [are labeled 'civilians'][.]").[24]

---

[24] In support of his claim that the AUMF "must be informed by the requirements of the Fourth Geneva Convention," Petitioner plucks one sentence from the U.S. Army Operational Law Handbook that states, "[u]nder the Geneva Conventions and [Additional Protocol] I, civilians are those whom [sic] are not members of a nation's armed forces."  See Pet. Mot. at 17. He also cites (without explanation) to paragraph 73 of the 1956 U.S. Army Field Manual, id., which states that persons committing hostile acts are not entitled to be treated as prisoners of war but fall within the meaning of a "protected person" under the Fourth Geneva Convention.  These sources do not support Petitioner's argument, however, because, among other reasons, both address international armed conflicts, not the non-international armed conflict at issue here.  For the reasons explained herein, in non-international armed conflicts, the law of war permits the military detention of all types of enemy forces, not just those enumerated in Article 4 (which lists the types of armed forces possibly entitled to prisoner-of-war status in international armed conflict).

34

Indeed, holding that the Geneva Conventions confer "civilian" status on enemy forces because they do not qualify as prisoners of war (for example, by not adhering to the laws of war) risks undermining a core purpose of the Geneva Conventions: encouraging compliance with the laws of war by affording special status and treatment to those who act accordingly.  See DoD Law of War Manual § 4.3.1 ("States have been reluctant to conclude treaties to afford unprivileged enemy belligerents the distinct privileges of POW status or the full protections afforded civilians."); cf. Al Warafi, 716 F.3d at 632 ("Without compliance with the requirements of the Geneva Conventions, the Taliban's personnel are not entitled to the protection of the Convention.").[25]

This conclusion is also consistent with Supreme Court and Court of Appeals decisions that have recognized the Executive's detention authority under the AUMF but never held that such authority is conditioned upon the provision or timing of a periodic review hearing of the type conducted by the PRB.  Based on its understanding of "longstanding law-of-war principles," the Supreme Court held that "Congress' grant of authority for the use of 'necessary and appropriate force'" in the AUMF "include[s] the authority to detain for the duration of the

---

[25] Petitioner cites to a law review article for the proposition that "law-of-war detention should be read to require an individualized determination of the likelihood of returning to battle," Pet. Mot. at 18 (emphasis added) (citing Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L. Rev. 2047, 2124-25 (2005)), but the article concludes that "[w]e do not claim that our proposed individualized approach to determining the end of hostilities in this context is a settled requirement of the customary laws of war," id. at 2126.

relevant conflict."  Hamdi, 542 U.S. at 521; id. at 588-89 (Thomas, J., dissenting); see also, e.g.,

Ali, 736 F.3d at 544 ("Detention under the AUMF may last for the duration of hostilities.")

(citations omitted).[26]  Contrary to Petitioner's suggestion about the applicability of certain

provisions of the Fourth Geneva Convention, the relevant law-of-war principles cited by the

Supreme Court in Hamdi were principles drawn from the Third Geneva Convention and similar

agreements that preceded it.  See Hamdi, 542 U.S. at 521 (citing, among other things, CG III Art.

118, but not GC IV).  Later, in Boumediene v. Bush, 553 U.S. 723 (2008), the Supreme Court

held that a Guantanamo detainee may challenge the lawfulness of his detention through a habeas

petition, an action in which the Government must demonstrate that he is part of, or substantially

supporting, al-Qaida, Taliban, or associated forces.  See, e.g., Ali, 736 F.3d at 544.  And while

the Boumediene decision explained that Guantanamo detainees "are entitled to a prompt habeas

corpus hearing," 553 U.S. at 795, a right that Petitioner has exercised but chosen not to pursue

for the past three years, the Court has not held that the Executive is required to provide any

additional process over the course of detention.  See, e.g., id. at 785 (deciding that CSRTs were

not an adequate substitute for habeas because "the consequence of error may be detention of

persons for the duration of hostilities that may last a generation or more").  Thus, neither the

---

[26] Congress has since reaffirmed its authorization of "[d]etention under the law of war without trial until the end of the hostilities authorized by the [AUMF]."  National Defense Authorization Act for Fiscal Year 2012 § 1021(c)(1), Pub. L. No. 112-81, 125 Stat. 1298, 1562 (Dec. 31, 2011).

Supreme Court nor the Court of Appeals has held that the Executive's detention authority under the AUMF is dependent upon, or somehow requires, the provision of a periodic review hearing.[27]

For the foregoing reasons, Petitioner's assertion that the AUMF and international law require the Executive to provide him with a periodic review hearing is unfounded.

## II.   Petitioner Has Not Been Deprived of Any of His Legal Materials.

Petitioner has access to all of his legal materials and is subject to the same camp policy regarding access to those materials as other similarly situated detainees.  Petitioner asks this Court, however, to order Respondents to "cease interfering with Petitioner's access to this habeas Court" by "depriv[ing] him of many" of "his legal papers for at least six months."  Pet. Mot. at 1, 3, 21.  One month prior to the filing of his motion, Petitioner's counsel informed Respondents that it was her "understanding that" officials at Guantanamo had "not returned" "legal papers" to Petitioner.  ECF No. 457-2.  Counsel for Respondents replied that the Department of Defense

---

[27]   As part of his argument, Petitioner also says he has "reason to believe" (Pet. Mot. at 5) that "the Defense Department's failure to provide a [PRB] hearing [to Petitioner] is motivated by a desire to subject Mr. Slahi to further interrogation."  Pet. Mot. at 18-19; see also Decl. of Nancy Hollander, ECF No. 453-1, at ¶ 17.  Nothing in the record supports such a belief.  Certainly, the letter Petitioner submits as his basis for that belief provides no such support.  In the letter, Petitioner claims that he spoke to the "prosecution team" assigned to another detainee who "offered to help [him] on condition [that he] ask the court to lift its order" (instituted at the request of Petitioner's counsel in 2009) that he not be interrogated.  See Slahi Letter, ECF No. 460-1 at 1.  The offer of "help" (if there was one) was made—as the letter makes clear, see id. ("Let me give you some context")—in connection with the "depriv[ation] of [his] so-called comfort items" after his move from one detention camp to another "about six months ago."  Id.  At no point does Petitioner say the *alleged* offer of help related to getting him a PRB hearing in exchange for lifting the six-year-old injunction against interrogating him, nor is there any indication that the "prosecution team" has any role in the PRB process.

had confirmed that Petitioner "is not missing any legal papers."  See id.  No further

communications occurred on this issue until the parties' Local Rule 7(m) conference.  At the

time Petitioner filed this motion, his counsel were "unable to confirm with [Petitioner] that all

legal papers" had "been returned" to him, Pet. Mot. at 3, nor were they willing, however, to wait

to file the motion to see if this particular dispute could be resolved without motions practice.

After the motion was filed and counsel visited Petitioner, counsel submitted a declaration stating

that "the vast majority of [Petitioner's] legal papers . . . have not been returned."  Declaration of

Theresa M. Duncan, ECF No. 457-1.

　　　　It is now clear that the parties' dispute derives from a misunderstanding about camp

policy where Petitioner is housed.  In unclassified terms, Petitioner, like the other similarly

situated detainees in his detention camp, is permitted to keep one legal bin of legal materials in

his cell at a given time.  If he wants access to his other legal materials, he may make a request for

those materials through the process with which he is already familiar.  That request will be

processed and legal materials in his cell will be swapped out on a one-for-one basis for the legal

materials he requests.  Respondents have submitted a classified declaration by Colonel David E.

Heath, Commander of the Joint Detention Group at Guantanamo, which supplements this

unclassified description by explaining in more detail the issues related to this dispute over

Petitioner's access to his legal materials.

　　　　Accordingly, as more fully set forth in Colonel Heath's declaration, Respondents have

not deprived Petitioner of access to his legal materials or to this Court.

### III.     Petitioner Does Not Have a Legally Cognizable Claim to Challenge the Purported "Arbitrary Restrictions" on Certain "Comfort" Items.

Petitioner also purports to challenge the conditions of his confinement because, he complains, Respondents have "depriv[ed] him [of certain comfort items] without notice or explanation."  Pet. Mot. at 22.  Specifically, he complains that Respondents have imposed "severe restrictions" upon him by depriving him of a laptop computer, photographs of his family, books, and personalized gifts that he has received from guards.  Pet. Mot. at 22.  He asserts that the deprivation of these items is unlawful "because they are arbitrary and bear no reasonable relation to any legitimate government interest."  Id.  Petitioner's claim, however, is fundamentally flawed because he has failed to allege the violation of a right to which he is entitled; he may not, as he suggests, challenge each and every decision of the administrators of the detention facility under a free-floating reasonableness test.

Petitioner bases his argument on the recent decision of the Court of Appeals in Hatim v. Obama, 760 F.3d 54 (D.C. Cir. 2014)—which in turn applied the Supreme Court's decision in Turner v. Safley, 482 U.S. 78 (1987)—in support of his argument that Respondents "may not introduce arbitrary or unreasonable restrictions on prisoners' rights."  Pet. Mot. at 21.  But Petitioner overlooks the crucial first part of the Turner analysis:  the identification of "a prison regulation [that] impinges on [an] inmate['s] *constitutional rights*."  Turner, 482 U.S. at 89 (emphasis added); see also Aamer, 742 F.3d at 1040 (assuming without deciding that a challenged regulation at GTMO "burdens fundamental rights") (quoting Turner, 482 U.S. at 87).

In other words, contrary to Petitioner's suggestion, a conditions-of-confinement claim in habeas is not a free-floating right to challenge every regulation in a detention facility under a reasonableness standard.  The narrow scope for such claims is consistent with the premise underlying Turner and its progeny, namely, that courts must afford "considerable deference to determinations of prisoner administrators" because "the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management."  Thornburgh v. Abbott, 490 U.S. 401, 407-08 (1989) (quoting Procunier v. Martinez, 416 U.S. 396, 404-05 (1974)); see also Bell v. Wolfish, 441 U.S. 520, 547 (1979) (prisoner administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

Here, Petitioner's claim fails on its face because he has not identified the deprivation of a right he has at Guantanamo that is protected under the Constitution.  Insofar as he contends that he should have been afforded "notice [and] explanation" about the deprivation of these comfort items, Pet. Mot. at 22, Petitioner appears to suggest the violation of due process rights of notice and an opportunity to be heard under the Fifth Amendment, but, as explained above, it is binding precedent in this Circuit that the Due Process Clause does not apply to Guantanamo detainees. See supra at 26-29.  Thus, in the absence of an alleged violation of a fundamental Constitutional right to which Petitioner is entitled, the Court's inquiry into Petitioner's claim simply ends at that point, and there is no reason for the Court to consider any other aspect of the Turner framework. See Dhiab v. Obama, -- F. Supp. 3d --, 2014 WL 5795483, at 5 (D.D.C. Nov. 7, 2014) (noting

40

that a <u>Turner</u> analysis "requires" a "constitutional challenge" and that the petitioner in <u>Dhiab</u> simply challenged "the day to day procedures that the medical staff at Guantanamo Bay use to carry out their mission" while "fail[ing] to identify any constitutional right or rights offended by the challenged practices").[28]

Respondents note, however, that Petitioner has not been deprived of all of the "comfort" items he identifies. Colonel Heath's classified declaration addresses issues related to the confiscation and return of these so-called comfort items. In unclassified terms, when Petitioner was transferred from one camp to another, some of the items in his cell were removed and not returned to him due to lack of space. Petitioner may, however, request certain items be returned to him through the same process with which he is already familiar. Certain items, determined to be contraband, will not be returned to him for the reasons set forth in Colonel Heath's declaration.

Accordingly, there is no merit to Petitioner's request that this Court order Respondents to show cause why they were imposing "arbitrary and severe restrictions on [his] conditions of confinement" by not returning to him certain comfort items. Pet. Mot. at 1, 22-23.

---

[28] Only after a petitioner has alleged the violation of a right protected by the Constitution should the Court consider the remainder of the <u>Turner</u> test, namely, (1) "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." 482 U.S. at 89-90.

**CONCLUSION**

For the reasons set forth above, the Court should deny Petitioner's Motion to Show

Cause.


Date: July 29, 2015                    Respectfully submitted,

                                       BENJAMIN C. MIZER
                                       Principal Deputy Assistant Attorney General
                                       Civil Division

                                       JOSEPH H. HUNT
                                       Branch Director
                                       Civil Division, Federal Programs Branch

                                       TERRY M. HENRY
                                       Assistant Director
                                       Civil Division, Federal Programs Branch

                                       _/s/ Joseph C. Folio III_____
                                       RODNEY PATTON
                                       JOSEPH C. FOLIO III
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       20 Massachusetts Ave., N.W.
                                       Washington, DC 20530
                                       Tel: (202) 305-4968
                                       Fax: (202) 616-8470
                                       Email: Joseph.Folio@usdoj.gov

                                       Counsel for Respondents